FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2018 MAY 22 AM 11: 29

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-1152-RBJ-MEH

BENJAMIN S. CARSON, Secretary of Housing and Urban Development,

      Plaintiff,

v.

ESTATE OF VERNA MAE GOLZ,
WILLIAM J. GOLZ, MARCUS J. GOLZ, MATTHEW J. GOLZ, and
UNKNOWN HEIRS AND CLAIMANTS OF THE ESTATE OF VERNA MAE GOLZ,

      Defendants.

---

## REPLY IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE ESTATE AS A DEFENDANT

---

      Defendant William J. Golz, Ph.D., ("**Defendant**" or "**Dr. Golz**"), is the son of Verna Mae Golz, ("**Verna Mae**"), and was personal representative and sole heir of her estate, (the "**Estate**"), through May 2, 2018, when Probate was closed. Doc. 108, Ex. B.[1] On April 23, 2018, Dr. Golz became the deed holder, (Doc. 108, Ex. A), of the property at 130 Beaver Creek Drive, Nederland, Colorado, (the "**Property**"), which is security for a Home Equity Conversion Mortgage loan, (the "**HECM loan**"), that was assigned to the Secretary of Housing and Urban Development, ("**HUD**" or the "**agency**"), in December 2011. Doc. 31, ¶ 43.

### PRELIMINARY STATEMENT

      Defendant accepts that were the United States to have a viable claim against Verna Mae which could be asserted against the Estate or Dr. Golz it would not be barred by a state nonclaim

---

1 In prior pleadings, Defendant has referred to Court filings by their docket entry number preceded by "ECF"; henceforth, Defendant will use the standard prefix, "Doc."

statute. Plaintiff's purported claim, predicated upon the dubious assertion that Verna Mae ceased to principally reside in the Property prior to her death, postulates a breach of contract claim for which the only remedy provided by the Notes and Deeds of Trust is foreclosure and sale of the Property, subject to the right of reinstatement. Even if that remedy could be effected by a sale of the Property retrospective to Verna Mae's lifetime, it is difficult to imagine how the Secretary would satisfy the constitutional requirement of providing Verna Mae with a meaningful pre- or post-deprivation hearing or with her contractual right to reinstate.

Magistrate Judge Michael E. Hegarty, ("**Judge Hegarty**"), controverted Defendant's intent in the motion to dismiss the Estate, converting it into a motion for summary judgment thus providing Plaintiff with a forum for a factual dispute predicated upon a contract claim. Even if that claim were not so obviously defeated by the plain language of the Notes and Deeds of Trust, the Estate should have been dismissed by this Court for lack of subject-matter jurisdiction over a retrospective foreclosure against a decedent or over nullification of a testamentary document.

Given the operative facts and matters at issue, Defendant has been as concise as justice permits whereby any further abridgment of this discussion would contravene the interests of justice. This is good cause for requesting that the District Judge permit this Reply to exceed by two pages the preferred five-page limit. *See* Judge R. Brooke Jackson's Practice Standards, at 2.

## BACKGROUND

In an April 6, 2018 email, Assistant United States Attorney, ("**AUSA**"), Jasand Mock advised that he intended to depose Defendant in an effort to establish that Verna Mae "ceased principally residing on the Property and became a domiciliary of Maricopa County[.]" On April 9, Defendant moved the Court to vacate the April-16, 2018 Status Conference, (the "**Status Con-**

**ference**"), to allow him to address Verna Mae's principal-residence in a motion for a protective order. Doc. 92. That motion was denied by Judge Hegarty. Doc. 98.

During the Status Conference, AUSA Mock asked the Court to entertain a foreclosure claim predicated upon a breach of the Notes concomitant to Plaintiff's presumption that Verna Mae ceased to principally reside in the Property prior to her death. Notwithstanding that the Court provided no notice to Defendant that he would be appearing at the Status Conference not as his own attorney but to give testimony, Judge Hegarty pursued discovery on Plaintiff's behalf by demanding that Dr. Golz answer a series of questions regarding Verna Mae's principal residence in 2010. *See* Doc. 100, at 7.

To answer Judge Hegarty's questions about Verna Mae's intent as to her principal residence, Defendant submitted a Position Paper with exhibits, (Doc. 103, at 7-9, § IV.A.), subject to the intervening caveat that "nothing in the law requires Defendant to establish his late-mother's intent and actions as to her principal residence." Doc. 100, at 8. Judge Hegarty dismissed Defendant's caveat, ignored the language in the motion to dismiss the Estate, (Doc. 103, at 11, ¶ 2), then reached back into the Position Paper and misrepresented that, since Defendant "wishes to support his Motion to Dismiss (liberally construed as brought pursuant to Fed. R. Civ. P. 12(b) (6)) with documents outside the pleadings, it is proper to inform the parties that the Court will convert the motion into a Motion for Summary Judgment[.]" Doc. 105.

Defendant immediately objected to Judge Hegarty's misrepresentation as inconsistent with Dr. Golz's pleadings and stated intentions. Doc. 106. That objection was overruled by the District Judge with a text entry. Doc. 107. To Plaintiff's benefit, without provision of any discourse on the Court's jurisdiction over, or the legal sufficiency of, Plaintiff's purported claims,

Judge Hegarty, *sua sponte,* solicited Plaintiff's pleadings and extended the time for Plaintiff to reply. Doc. 114. In response to the Court's solicitation of a factual inquiry, Plaintiff provided documents that have no probative value as to any matter now before the Court nor do they have any purpose whatever other than as an artifice to insinuate scandal and intrigue.

Judge Hegarty's series of actions were prejudicial to Defendant, whom pleads facts with care and argues with as much command of substance, and respect for procedure, as is possible given the time he has available for legal research. Defendant is not, however, a trained attorney but a scientist, an engineer, and a teacher, whose pleadings are entitled not only to a liberal construction but to an interpretation that is consistent with their intended meaning. Given any fair reading, Defendant's motion to dismiss the Estate should have been evaluated pursuant to another standard, including, but not limited to, Fed. R. Civ. P. 12(b)(1), for lack of subject-matter jurisdiction:

## ARGUMENT

Plaintiff was notified in a September-17, 2014 letter from Jon Kitchel, Esq., that Defendant had opened probate in Maricopa County, Arizona. Doc. 81, Ex. N. The agency now asserts that three years later, in their May-9, 2017 complaint, Plaintiff made a breach of contract claim against Verna Mae because she "ceased principally residing on the Property[.]" Doc. 1, ¶ 50. Defendant addressed that averment in the Amended Answer, (Doc. 64, ¶ 50), and the presumptions Plaintiff now proffers to suggest that the Property ceased to be Verna Mae's principal residence prior to her death are immaterial to any matter now before the Court:

The Second Note, (Doc. 31, Ex. 3, ¶ 4(C)), and Second Deed of Trust, (Doc. 31, Ex. 5, ¶ 10), share identical language: "Borrower shall have no personal liability for payment of the debt.

4

Lender shall enforce the debt only through sale of the Property[,]" to which the Second Deed of Trust adds: "Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted." Doc. 31, Ex. 5, ¶ 11.

The Notes and Deeds of Trust offer Plaintiff no provision to bring any claim against the Estate, or against Defendant, for Verna Mae's ceasing to principally reside in the Property. If, *in arguendo*, Plaintiff could define a nonfrivolous claim for a retrospective foreclosure prior to May 16, 2014, this would require Plaintiff to petition the courts to invalidate the Personal Representative's Deed thus reversing the probate court's distribution of the Estate's only asset, the Property. To be clear, Defendant's action as Personal Representative to distribute the Property and close Probate did not infringe any rights that Plaintiff could have legitimately enforced in this Court, for, even if probate were to be reopened, to effect a retrospective foreclosure, the agency would have to force a retrocession of the Property from the Estate to Verna Mae, nullifying her testamentary document. These are rights that cannot be enforced by this Court which lacks subject-matter jurisdiction to interfere in the probating or administration of a will. *See, e.g., Byers v. Mcauley*, 149 U.S. 608 (1893); *see also, e.g., Sutton v. English*, 246 U.S. 199 (1918).

During the Status Conference, AUSA Mock stated that, "I think Ms. Golz had moved to Arizona by, perhaps, as early as 2009, which is a breach of the notes[,]" Doc. 99, consequent to which Plaintiff proposed to effectuate a retrospective foreclosure and sale in 2009 – two years before Financial Freedom Senior Funding Corp., ("**Financial Freedom**"), assigned the HECM loan to the Secretary, (Doc. 31, ¶¶ 29-43), and two years before Financial Freedom and Plaintiff released Lot 2. *See* Doc. 64, ¶¶ 71-79; *and see* Doc. 31, at 6, n.2.

The agency asks to assert rights that it claims accrued to Plaintiff in 2009, prior to the release of Lot 2, consequent to which Verna Mae, and by succession, her Estate, would be entitled to enforce their retrospective rights: to an $89,000 setoff for the market-depreciation loss on Lot 2, to void the Notes and Deeds for fraud in the inducement, and for any other provable damages that Verna Mae suffered during the nine years that HUD and their lender wrongfully held Lot 2. *See* Doc. 64, ¶¶ 76 and 79; *see also* Doc. 81, at 2, n.2.

The documented facts of the loan origination are sufficient to the inference that Verna Mae was deprived of Lot 2, valued at over $100,000, through a fraud. Because that fraud entailed falsification of the settlement statement, *i.e.*, the HUD-1, it was a federal felony. The Wartime Suspension of Limitations Act, 18 U.S. Code § 3287, has been successfully pleaded by the United States to pursue prosecutions for criminal fraud beyond any statute of limitation. Defendant documented the operative facts of that fraud in a July 11, 2016 letter to the HUD Office of Inspector General which was copied, on July 12, 2016, to Kevin Traskos, Chief of the Civil Division for the United States Attorney's Office for the District of Colorado. **Exhibit A**.

## CONCLUSION

Plaintiff's response, (Doc. 115, at 12, n.6), reproduces Line 3 of the Probate Closing Statement, (Doc 108, Ex. B, at 1), and misrepresents to the Court that Defendant "did not disclose the existence of the United States' pending claim." As made clear in Defendant's pleadings, (Doc. 103, at 11), the Notes and Deeds of Trust do not constitute a claim against the Estate but a lien against the Property, which Defendant distributed with a Personal Representative's Deed, *cum onore*.

6

As AUSA Mock was advised via email, prior to distributing the Property, Defendant consulted a probate attorney in Colorado.[2] As Defendant has noted in the pleadings, he discussed Plaintiff's lien with the Arizona attorney who opened Probate for the Estate in 2014, who reviewed the Probate Closing Statement in light of that lien and the relevant facts.[3] Whereas neither Plaintiff nor any other claimant had any legitimate claim pending that could have been asserted against the Estate in this Court, or in any other court, Probate was closed, whereupon Defendant respectfully requests that this Court dismiss the Estate as a defendant without further delay.

DATED at Scottsdale, Arizona this 21st day of May, 2018.

Respectfully submitted,

s/William J. Golz
*William J. Golz, Ph.D.*
Defendant, pro se
29714 N. 152nd Way
Scottsdale, AZ 85262
Phone/Facsimile: (480) 816-5019
Email: wgolz@alumni.lsu.edu

---

2 In an April 20, 2018 email to Judge Hegarty, AUSA Mock stated that "Dr. Golz has indicated that he wishes to consult with a Colorado probate attorney and then advise me with regard to his position[.]" Defendant sought counsel, and, as promised, communicated his position to AUSA Mock.

3 In Plaintiff's response, AUSA Mock misleads the Court with the statement: "On May 2, 2018, Dr. Golz (representing himself without a lawyer) filed a Closing Statement in the Arizona probate court[,]" (Doc. 115, at 12), when AUSA Mock was advised that Defendant had consulted with the attorney that opened probate for the Estate in 2014. Doc. 108, at 2.

# Exhibit A

**HP Officejet Pro 8610 Series**

Last Transaction

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|-----------|----------|-------|--------|
| | | | | Digital Fax | | |
| Jul 12 | 11:58AM | Fax Sent | 303-454-0400 | 13:01 N/A | 46 | OK |

DATE: JULY 12TH, 2016

TO: KEVIN TRASKOS, ESQ.
CHIEF, CIVIL DIVISION
UNITED STATES ATTORNEY'S OFFICE, DIVISION OF COLORADO
FAX: (303) 454-0400

FROM: WILLIAM GOLZ, Ph.D.
FAX: (303) 258-0443

RE: DEMAND LETTER FROM THE DEPARTMENT OF JUSTICE, REFERENCING:

ACCOUNT NO. 2016A58338/PRE
REFERRED AMOUNT $275,073.39

PAGES: FORTY-SIX (46) INCLUSIVE OF THIS COVER PAGE

- CONFIDENTIALITY NOTICE -

THIS FACSIMILE TRANSMISSION (AND/OR DOCUMENTS ACCOMPANYING IT) MAY CONTAIN CONFIDENTIAL INFORMATION BELONGING TO SENDER WHICH IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY HEREIN NAMED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISCLOSURE, COPYING, DISTRIBUTION, OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR PLEASE NOTIFY ME BY TELEPHONE AT (303) 258-0443.

**Date**    July 12th, 2016

**To**    Kevin Traskos, Esq.
       Chief, Civil Division
       United States Attorney's Office, Division of Colorado
       1225 17th Street, Suite 700
       Denver, CO 80202

       Via:    Facsimile (303) 454-0400 (Enclosure with Exhibits)
             Certified Mail No. 7015 0640 0004 4137 0444 (Enclosure without Exhibits)

**From**    William Golz, Ph.D.
       130 Beaver Creek Drive
       Nederland, CO 80466

**Re**    Demand Letter from the Department of Justice ("DOJ") referencing:

       Account No.          2016A58338/PRE,
       Referred Amount      $275,073.39<sup>*</sup>,

       regarding the Home Equity Conversion Mortgage loan:

       Borrower            Verna M. Golz
       Prop. Add.          130 Beaver Creek Drive
                        Nederland, CO 80466

       Funded Date        01/24/2002
       FHA Case No.       052-1965070

Dear Mr. Traskos:

       This is to provide the DOJ with my July 11th, 2016 letter to the Department of Housing and Urban Development ("HUD") Office of Inspector General wherein I discuss Financial Freedom Senior Funding Corporation's mortgage-origination fraud and their consequent assignment to the Secretary of HUD of the Deed of Trust that is the security instrument for the subject debt which HUD proffered to the DOJ for collection.

       Sincerely,



William Golz, Ph.D.

Enclosure

CC: Secretary Julián Castro
      Jordan C. May, Esq.

---

<sup>*</sup> As detailed in my previous correspondence to the DOJ, the Referred Amount of the debt is an error: pursuant to HUD directing their servicer, Novad Managment Consulting, to notify me of their intent to initiate foreclosure in August 2015, I submitted my first "qualified written request" and "notice of error" to Novad for their "failure to provide an accurate payoff balance," per the Real Estate Settlement Procedures Act. When Novad ignored my request, in March 2016 I filed a complaint with the Consumer Financial Protection Bureau, asking that the Bureau seek a response from Novad. When the Bureau advised that Novad was ignoring their requests to register and address my complaint, I contacted Novad and explained that I was awaiting their response through the Bureau which acts as a neutral third-party in the complaint-resolution process. This ongoing evasion of my requests for an accurate payoff balance will again prevent me from paying off this loan, obtaining permitting and completing needed repairs that will be precluded by onset of winter conditions.

DATE: JULY 12TH, 2016

TO: OFFICE OF INSPECTOR GENERAL ("OIG")
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD")
FAX: (202) 708-4829

FROM: Dr. WILLIAM GOLZ, Ph.D.
FAX: (303) 258-0443

RE: REQUEST TO THE OIG FOR AN INVESTIGATION INTO MORTGAGEE'S INTENTIONAL FRAUD DURING LOAN ORIGINATION AND CONSEQUENT, POTENTIAL MAIL AND/OR WIRE FRAUD INVOLVING ANY MISREPRESENTATIONS MORTGAGEE MAY HAVE MADE TO FACILITATE A CLAIM TO THE SECRETARY OF HUD FOR FEDERAL HOUSING ADMINISTRATION MORTGAGE INSURANCE FOR THE HOME EQUITY CONVERSION MORTGAGE LOAN:

| | |
|---|---|
| MORTGAGEE | FINANCIAL FREEDOM SENIOR FUNDING CORPORATION AND SII |
| MORTGAGOR | VERNA M. GOLZ |
| PROP ADDRESS | LOT 19 (BEAVER VALLEY ESTATES) |
| | 130 BEAVER CREEK DRIVE |
| | NEDERLAND, CO 80466 |
| FUNDED DATE | 01/24/2002 |
| FHA CASE NO. | 052-1965070 |

PAGES: FORTY-FOUR (44) INCLUSIVE OF THIS COVER PAGE

- CONFIDENTIALITY NOTICE -

THIS FACSIMILE TRANSMISSION (AND/OR DOCUMENTS ACCOMPANYING IT) MAY CONTAIN CONFIDENTIAL INFORMATION BELONGING TO SENDER WHICH IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY HEREIN NAMED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISCLOSURE, COPYING, DISTRIBUTION, OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR PLEASE NOTIFY ME BY TELEPHONE AT (303) 258-0443.

FROM  Dr. WILLIAM GOLZ, Ph.D.
      130 BEAVER CREEK DRIVE
      NEDERLAND, CO 80466

  TO  OFFICE OF INSPECTOR GENERAL
      U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD")
      451 7TH STREET, SW
      WASHINGTON, DC 20410
      VIA: FACSIMILE (202) 708-4829 AND CERTIFIED MAIL No. 7015 0640 0004 4137 0451

  RE  HOME EQUITY CONVERSION MORTGAGE ("HECM") LOAN:

      MORTGAGEE     FINANCIAL FREEDOM SENIOR FUNDING CORPORATION ("FF") AND SII
      MORTGAGOR     VERNA M. GOLZ
      PROP ADDRESS  LOT 19 (BEAVER VALLEY ESTATES)
                    130 BEAVER CREEK DRIVE
                    NEDERLAND, CO 80466
      FUNDED DATE   01/24/2002
      FHA CASE NO.  052-1965070:

(i) **Fraud** (January 2002): prior to closing, the lender requested "Condition Responses" wherein the appraiser identified Lot 2 as separately salable—with tax and parcel numbers separate from the dwelling and its site, Lot 19; FF then used the Deed of Trust ("DOT") to transfer ownership of Lot 2 to FF constituting an intentional theft and a payment by my mother to FF which the Mortgagee did not disclose on the HUD-1.

(ii) **Gain** (August 2011): when FF released Lot 2, my mother's loss (of principal due to depreciation) was approximately $89,261; FF's gain was an equivalent $89,261 (the "Gain").

(iii) **Misrepresentation** (December 2011): if, in keeping with Generally Accepted Accounting Principles ("GAAP") and federal regulation, FF had credited the Gain to my mother's loan account, her balance would have fallen below the 98% threshold required for FF to make a claim for full payment on the Federal Housing Administration (the "FHA"); FF did not credit the Gain to my mother's account and, in apparent furtherance of their original fraud, consummated their claim on FHA by directing Mortgage Electronic Registration Service Inc ("MERS") to assign the DOT to the Secretary of HUD.

---

## FACTS

### MORTGAGEE FRAUD AT LOAN ORIGINATION

My mother Verna M. Golz was aged seventy-five (75) years when she executed an agreement that FF proffered to her as necessary to obtain her HECM loan. The fact of FF's fraud is unambiguous, as explicated below in context of the several key loan-documents that are provided as exhibits:

On December 6th, 2001, FF's appraiser signed a report opining a value of $246,000 for my mother's house and its site, Lot 19 (the "Appraisal"). **Exhibit 1.**

On December 7th, 2001, the loan originator—Don Wilson of First National Bank Mortgage, transmitted a Good Faith Estimate (the "GFE") to my mother to provide her with "updated numbers based on your appraisal," which the GFE confirmed as $246,000. **Exhibit 2.**

Subsequent to the date the Appraisal was signed, but prior to closing, the appraiser provided Condition Responses at "the request of the lender", which noted, *inter alia*: "a second lot owned by Ms. Verna Golz. That lot is Lot 2, Beaver Valley Estates, and is approximately 1 acre. It is separate from the appraised property, Lot 19, Beaver Valley Estates, which is approximately 1 acre and has the 1,224 square foot home located there. The lots have never been joined and have separate parcel numbers and tax identification numbers." See **Exhibit 3**.

Notwithstanding the appraiser's condition response that Lot 2, "is separate from the appraised property, Lot 19," Mr. Wilson had my mother execute a DOT that encumbered both Lot 19 and Lot 2 as security for payment of the HECM loan. **Exhibit 4**. It is clear from the facts that the lender's use of the DOT to transfer ownership of Lot 2 from my mother to FF was an intentional theft that constituted a payment from my mother to FF which the lender was required to, but did not, disclose on the HUD-1. **Exhibit 5**.

## ISSUES AND ANALYSIS

### VALUATION OF LOT 2

#### *AT LOAN ORIGINATION IN JANUARY 2002*

In the Condition Responses, the appraiser valued Lot 19 at $95,000. See **Exhibit 3**. Per the survey documents and the Boulder County Assessor, Lot 19, upon which my late-mother's dwelling is sited, is 0.92 acres and encompasses no part of Beaver Creek which is contained entirely on Lot 2 which is 1.00 acres. Using the appraised value of Lot 19 and making an upward adjustment for an additional 0.08 acres yields a valuation of $103,261 for Lot 2. (This is a conservative opinion as no upward adjustment has been made for Beaver Creek, which would increase the value of Lot 2.)

#### *UPON RELEASE AND REASSIGNMENT IN 2011*

When FF released Lot 2 to my mother in summer 2011, the only payment made was $2,500 to her attorney to cover fees and costs. During the period that began that summer and ended in December 2011, when FF assigned the DOT to the Secretary of HUD, Colorado real-estate values, especially those for vacant lots, were at or near their nadir after the 2008 Global Financial Crisis. Although there were very few land sales bracketing the period, a comparative market analysis of active listings of 1-2 acre, rural lots yields a plausible estimate of fair market value for Lot 2 as $14,000.

## MORTGAGEE'S GAIN CORRESPONDING TO MORTGAGOR'S LOSS

Since the facts show that FF acted with intent to obtain my mother's vacant property, Lot 2, without payment, her loss can be evaluated within the purview of the Mandatory Victims Restitution Act, Title 18 U.S. Code § 3663A, where the authority from which to calculate her economic loss is provided by *Benjamin Robers v. United States, 572 U. S. 310 (2014)* as the value of my mother's property at the moment of FF's original fraud less the depreciated value of her property when it was released to her in 2011 which, using the valuation analysis above, is approximately $89,261, which, by definition, is in equivalence with the Mortgagee's Gain.

## SECRETARY ACCEPTANCE OF HECM ASSIGNMENT AND PAYMENT OF CLAIM WAS PREDICATED UPON MISREPRESENTATION BY THE MORTGAGEE

On December 9th, 2011, FF's nominee MERS assigned the DOT to the Secretary of HUD (the "Assignment"). **Exhibit 6:**

As a precondition to the Assignment, the Mortgagee was required to certify to the Secretary that the loan balance had reached 98% of the "maximum claim amount" which, given the facts, is a misrepresentation: had the Mortgagee credited their Gain of $89,261 to my mother's loan account, as required by GAAP and federal regulation, her loan balance would have been well below the 98% threshold required for FF to make a claim on FHA for full payment of the mortgage insurance. FF did not credit the Gain to my mother's account and in an evident furtherance of their loan-origination fraud perfected their FHA mortgage-insurance claim by directing MERS to assign the DOT to the Secretary. The failure to credit my mother's account with the Gain may have also created a tax liability for FF, equivalent to the marginal rate on any portion of that Gain that FF would have been required to report on their federal tax return that covered the period when the release and Assignment took place.

## COMMENT

The lost-opportunity cost a bank incurs when a mortgage fraud deprives the institution of the ability to make a more-profitable investment is trivial in comparison to the damages suffered by my mother pursuant to the fraud FF worked upon her: when Financial Freedom used HUD's HECM program to rob my 75-year old mother of her vacant property, they stripped her of her dignity by taking the only means she had left to finance major health and safety repairs when circumstances deprived her of a basic necessity—a dependable supply of clean water in her home. See my January 18th, 2015 letter to Secretary Julián Castro, **Exhibit 7.**

# Exhibit 1

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City Nederland (Mail) | County Boulder State CO Zip Code 80466 |
| Lender or Client | FNB Mortgage Company/HUD |

### SCOPE OF THE APPRAISAL
This report as defined by Standard 2.2 of the Uniform Standards of Professional Appraisal Practice is a summary report and the result of a complete appraisal analysis.

### SITE
The well and septic appear to be properly located on the site and in good working condition. It is not feasible to connect to public water and sewer systems, which are available in the Town of Nederland, approximately 1/2 mile away. Locations meet HUD standards and specifications. No well test was provided for review.

### ADDITIONAL FEATURES
The subject property has a sleeping loft area above the front family room, accessible by a ladder. There also is a pantry adjacent to the dining area, built-in shelving in the front family room and fencing along a portion of the property, which abuts a stream.

### CONDITION OF IMPROVEMENTS
The crawl space was weatherized in 1990. It is lined with Visquine and the floor is insulated. Other improvements include: A new kitchen door, leading to the garage; newer storm windows; and newer ceramic tile in the bath. The attic also has 6-8 inches of blown insulation.

The furnace has been turned off by the owner, and would need to be turned on to determine whether it is functioning. The home also has a broken garage window that would need to be repaired, and is in need of exterior paint. Because of the age of the home and the concern over the possible existence of lead-base paint materials, the existing paint would need to be scraped and the scrapings would need to be properly disposed of.

### COMMENTS ON SALES COMPARISON
An extensive search was performed to find mountain homes on similar small acreage, and similar to the subject property in quality, design, GLA and market appeal. The comparables used were the best available at the time of this report and bracket the subject property in GLA.

Adjustments are as follows: $20,000 against one property with nearly 2 acres, based on market reaction; $20,000 for properties with a superior quality of construction; $20,000 against properties that are newer, or those that have been updated/remodeled and have a newer effective age, as a result; $500 per bathroom fixture; $30 per above-grade square foot; $5 per basement square foot, plus an additional $5 per square foot for finish; $2,000 for properties with electric heat, an inferior heat source; $2,500 per garage bay; $500 per deck; and $1,000 for a fireplace and $2,000 for a wood stove.

Comp 1 is an older sale, but is included because of similarities in square footage and acreage. It is adjusted for: One less bathroom fixture; less above-grade square footage; a basement; electric baseboard heat; no garage; a deck; and no wood burning fireplace.

Comp 2 is a more recent sale and was weighed heavily in this analysis. It is a custom cedar home, and was adjusted for having a superior quality of construction. It also was adjusted for: Age; three additional bathroom fixtures; less square footage; an additional garage bay; two decks; and no fireplace or wood burning stove.

Comp 3 is an older sale, but is the only one within the subdivision that is similar to the subject in square footage and market appeal. It was adjusted for having: More acreage; being in superior condition, because it has undergone updating/remodeling, which includes pine floors, saltillo tile, custom wood work, etc.; two additional bathroom fixtures; more square footage; no garage; a deck; and no fireplace.

### FINAL RECONCILIATION
The cost approach was considered, but N/A because of the age of the subject property. The income approaches was considered but N/A due to the lack of rental data in this predominantly owner occupied area and/or the lack of rental property sales to determine a GRM.

# Complete Appraisal Analysis - Summary Appraisal Report
## UNIFORM RESIDENTIAL APPRAISAL REPORT

FHA#052-1965070  File No. 01KG0801

**SUBJECT**

| | |
|---|---|
| Property Address | 130 Beaver Creek Drive  City Nederland (Mail)  State CO  Zip Code 80466 |
| Legal Description | Lot 19 Beaver Valley Estates  County Boulder |
| Assessor's Parcel No. | 158314001019 Schedule #0023853  Tax Year 2000  R.E. Taxes $ 798.92  Special Assessments $ None |
| Borrower Verna M. Golz | Current Owner Verna M. Golz  Occupant [X] Owner  Tenant  Vacant |
| Property rights appraised [X] Fee Simple  Leasehold | Project Type  PUD  Condominium (HUD/VA only)  HOA$ N/A /Mo |
| Neighborhood or Project Name  Beaver Valley Estates | Map Reference 2080  Census Tract 138.00 |
| Sale Price $ Reverse Mortgage  Date of Sale 11/30/01-I | Description and $ amount of loan charges/concessions to be paid by seller  None |
| Lender/Client FNB Mortgage Company/HUD | Address 1650 Pace Street, Longmont, CO 80501 |
| Appraiser Chet Buhrmann-Crt.Gen.App. | Address P.O. Box 718, Longmont, CO 80501 |

**NEIGHBORHOOD**

| Location | Urban | Suburban [X] | Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|---|
| Built up | Over 75% | 25-75% [X] | Under 25% | | PRICE $(000) | AGE (yrs) | One Family 65 | [X] Not Likely  Likely |
| Growth rate | Rapid | Stable [X] | Slow | Owner [X] | 165 Low New | | 2-4 fam | In process |
| Property values | Increasing | Stable [X] | Declining | Tenant | 500 High 45 | | Multi-family | To: |
| Demand/supply | Shortage | In balance [X] | Over supply | Vacant (0-5%) [X] | Predominant | | Commercial 5 | |
| Marketing time | Under 3 mos. | 3-6 mos. [X] | Over 6 mos. | Vacant (over 5%) | 250 35 | | Forestry 30 | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: The subject's neighborhood is bounded to the north by County Road 126N, to the east by Peak To Peak Highway, to the south by Eldora Road and to the west by national forest land.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): Schools, limited employment and some suburban amenities are located in Nederland. Additional employment and amenities are located in Boulder. Nederland is close to Eldora ski resort and offers good mountain recreation opportunities. Homes are of average quality construction and are of average market appeal. Nederland serves as a commuter area for Boulder and the Denver metro employment areas. Police and fire protection is adequate.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Market conditions have been steady to improving over the past 5 years. Increased sales have resulted in fewer active sales listings and strengthening price levels. Due to the winter season marketing times are approaching 6 months for properties that are priced within the market. Financing is typically cash, conventional and government insured loans with minimal to no seller participation for resales and 0-2 seller points for new construction.

**PUD**

| Project Information for PUDs  (If applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)?  Yes  No | |
|---|---|
| Approximate total number of units in the subject project  N/A | Approximate total number of units for sale in the subject project  N/A |
| Describe common elements and recreational facilities:  N/A | |

**SITE**

| | | | |
|---|---|---|---|
| Dimensions  No Survey Provided For Review | | Topography | Generally Level |
| Site area  1.02 Acres M/L Per County Records | Corner Lot  Yes  No [X] | Conforming | |
| Specific zoning classification and description  F-Forestry/Residential | | Shape | Rectangular |
| Zoning compliance [X] Legal  Legal nonconforming (Grandfathered use)  Illegal  No zoning | | Drainage | Away From Improvements |
| Highest & best use as improved: [X] Present use  Other use (explain) | | View | Mountains/Stream |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | Landscaping | Natural |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | Gravel Typical | [X] | | Driveway Surface | Gravel |
| Gas | | Propane-Typical | Curb/gutter | None-Typical | | | Apparent easements | Typical P.U.E assmd |
| Water | | Well-Typical | Sidewalk | None-Typical | | | FEMA Special Flood Hazard Area  Yes  No [X] | |
| Sanitary sewer | | Septic-Typical | Street lights | None-Typical | | | FEMA Zone  X  Map Date 06/02/1995 | |
| Storm sewer | | None-Typical | Alley | None-Typical | | | FEMA Map No.  08013C 0484F | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): There was no survey provided for review, therefore typical utility easements are assumed. There were no encroachments or adverse conditions noted at the time of inspection.  *** See Additional Comments ***

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | One | Foundation | Concrete | Slab | Garage | Area Sq. Ft. | None | Roof | 6-8"Btwn [X] |
| No. of Stories | One | Exterior Walls | Wood | Crawl Space | 87% | % Finished | N/A | Ceiling | |
| Type (Det./Att.) | Detached | Roof Surface | Asphalt Shingle | Basement | None | Ceiling | N/A | Walls | Conceal [X] |
| Design (Style) | Ranch | Gutters & Dwnspts. | Painted Metal | Sump Pump | None | Walls | N/A | Floor | Crawl [X] |
| Existing/Proposed | Existing | Window Type | Wood Casement | Dampness | None Noted | Floor | N/A | None | |
| Age (Yrs.) | 1963/38 | Storm/Screens | Yes/Yes | Settlement | None Noted | Outside Entry | No | Unknown | |
| Effective Age (Yrs.) | 20 Years | Manufactured House | No | Infestation | None Noted | | | Assumed Adequate | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | None |
| Level 1 | 1 | 1 | 1 | 1 | | | | 3 | 1.00 | | | 1224 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains: 7 Rooms; 3 Bedroom(s); 1.00 Bath(s); 1,224 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Wood/Carpet/Vinyl/Average | Type | PFA | Refrigerator | | None | | Fireplace(s)# 1 +W S [X] | | None | |
| Walls | Wood/Drywall/Average | Fuel | Propane | Range/oven | | Stairs | | Patio | None | Garage | # of cars |
| Trim/Finish | Stained Wood/Average | Condition | Turned Off | Disposal | [X] | Drop Stair | | Deck | None | Attached | 1 Car |
| Bath Floor | Vinyl/Average | COOLING | | Dishwasher | [X] | Scuttle | [X] | Porch | Stoop | Detached | |
| Bath Wainscot | Ceramic Tile/Average | Central | None | Fan/Hood | [X] | Floor | | Fence | Wire | Built-in | |
| Doors | Hollow Core/Average | Other | None | Microwave | | Heated | | Pool | None | Carport | |
| | | Condition | None | Washer/Dryer | | Finished | | | | Driveway | 1 Car |

Additional features (special energy efficient items, etc.): The subject property has a gas fireplace and a wood burning stove.  *** See Additional Comments ***

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: The subject property is in average condition, and of average quality construction. Physical depreciation is related to the subject's age. There was no functional or external obsolescence noted at the time of inspection  *** See Additional Comments ***

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: There were no adverse environmental conditions noted at the time of inspection and none are assumed to exist. The appraiser is not an expert in this field. *** See Statement of Limiting Conditions.***

| | | | |
|---|---|---|---|
| Freddie Mac Form 70 6-93 | 12 CH. | PAGE 1 OF 2 | Fannie Mae Form 1004 6-93 |

**Valuation Section**

## COST APPROACH

| | | |
|---|---|---|
| ESTIMATED SITE VALUE ............................=$ | | N/A |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | | |
| Dwelling _____ Sq. Ft @ $ _____ =$ _____ | | N/A |
| _____ Sq. Ft @ $ _____ = _____ | | N/A |
| Garage/Carport _____ Sq. Ft @ $ _____ = _____ | | N/A |
| Total Estimated Cost New ..............=$ _____ | | N/A |
| Less    Physical _____ Functional _____ External _____ | | |
| Depreciation _____ = $ | | N/A |
| Depreciated Value of Improvements ...............=$ | | N/A |
| "As-Is" Value of Site Improvements ...............=$ | | N/A |
| INDICATED VALUE BY COST APPROACH    N/A | | N/A |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property: Site value is estimated by the sales comparison method of valuation. No functional or external depreciation noted. Physical depreciation is noted, and relates to the age of the subject property. The subject conforms to minimum HUD standards. Because of the age of the subject property, the cost approach was not considered in the analysis. Therefore, the jurisdictional exception rule is applied in this case.   ***See Attached Sketch***

Remaining Economic Life: 45   Remaining Physical Life: 45

## SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 130 Beaver Creek Drive Nederland (Mail) | 755 West First Street Nederland | | 49 Wildewood Drive Nederland (Mail) | | 250 Crestwood Court Nederland (Mail) | |
| Proximity to Subject | | 1/2 Mile Southeast Of Subject | | 1 1/2 Miles Southeast Of Subject | | 2 Blocks Northwest Of Subject | |
| Sales Price | $   Reverse Mortgage | $   227,500 | | $   285,000 | | $   299,000 | |
| Price/Gross Liv. Area | $   200.98 ☐ | $   245.68 ☐ | | $   259.09 ☐ | | $   213.57 ☐ | |
| Data and/or Verification Source | County Records Inspection | MLS/Realtor DOM: 96 MLS# 242117 Listed: 10/2000 | | MLS/Realtor DOM: 52 MLS# 318554 Listed: 9/2001 | | MLS/Realtor DOM: 58 MLS# 248031 Listed: 1/2001 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conventional No Seller Points | | Conventional No Seller Points | | Conventional No Seller Points | |
| Date of Sale/Time | | 01/19/2001   Closed | | 11/14/2001   Closed | | 03/27/2001   Closed | |
| Location | Beaver Valley Est/Avg | Nederland/Avg | -0- | Big Springs/Avg | -0- | Beaver Valley Est/Avg | -0- |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1.02 Acres | 1.25 Acres | -0- | 1 Acre | -0- | 1.90 Acres | -20,000 |
| View | Mountains | Mountains | -0- | Mountains | -0- | Mountains | -0- |
| Design and Appeal | Ranch/Average | Two Story/Average | -0- | Ranch/Average | -0- | Two Story/Average | -0- |
| Quality of Construction | Wood/Frame/Average | Wood/Frame/Average | | Wood/Frame/Good | -20,000 | Wood/Frame/Average | |
| Age | 1963/38 Years | 1967/34 Years | -0- | 1997/4 Years | -0- | 1978/23 Years | -0- |
| Condition | Average | Average | | Good | -20,000 | Good | -20,000 |
| Above Grade | Total │ Bdrms │ Baths | Total │ Bdrms │ Baths | | Total │ Bdrms │ Baths | | Total │ Bdrms │ Baths | |
| Room Count | 7 │ 3 │ 1.00 | 7 │ 2 │ .75 | +500 | 6 │ 3 │ 1.75 | -1,500 | 6 │ 2 │ 1.50 | -1,000 |
| Gross Living Area | 1,224 Sq. Ft. | 926 Sq. Ft. | +8,900 | 1,100 Sq. Ft. | +3,700 | 1,400 Sq. Ft. | -5,300 |
| Basement & Finished Rooms Below Grade | None N/A | 415 SF Unfinished | -2,100 | None N/A | | None N/A | |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | PFA/None | EBB/None | +2,000 | PFA/None | | PFA/Ceiling Fans | -0- |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 1 Car Attached | None | +2,500 | 2 Car Detached | -2,500 | None | +2,500 |
| Porch, Patio, Deck, Fireplace(s), etc. | Stoop, Deck Fireplace/Wood Stove | Stoop, Deck Fireplace/None | -500 +2,000 | Stoop, Decks None | -1,000 +3,000 | Stoop, Deck None/Wood Stove | -500 +1,000 |
| Fence, Pool, etc. | Fencing | Fencing | | Fencing | | Fencing | |
| Additional Features | Sleeping Loft | None | -0- | Garage Loft | -0- | None | -0- |
| Net Adj. (total) | | ☐ + ☒ - $ | 13,300 | ☐ + ☒ - $ | -38,300 | ☐ + ☒ - $ | -43,300 |
| Adjusted Sales Price of Comparable | | Gross 8.1% Net 5.8% $   240,800 | | Gross 18.1% Net -13.4% $   246,700 | | Gross 16.8% Net -14.5% $   255,700 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): All comps sold within 12 months from the effective date of this appraisal. Comps 1 and 3 are slightly older, but were included because of their similarity to the subject property and because of a lack of similar resales in this small mountain town. Financing was similar and typical of today's market, no adjustment was necessary.   ***See Additional Comments***

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | No previous sale past 1 year, per county records. | No previous sale in the past 1 year, except noted, per MLS | No previous sale in the past 1 year, except noted, per MLS | No previous sale in the past 1 year, except noted, per MLS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: There is currently no known agreement of sale or listing of the subject or comparables used in the preparation of this report.   ***See USPAP Compliance Addendum.***

| | | | | |
|---|---|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | | | $ | 246,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ _____ /Mo. x Gross Rent Multiplier _____ = $ | | | | N/A = $ N/A |

This appraisal is made ☐ "as is"   ☒ subject to the repairs, alterations, inspections or conditions listed below   ☒ subject to completion per plans and specifications.

Conditions of Appraisal: The subject property has been appraised "subject to completion of specified repairs."

***See Certification and Statement of Limiting Conditions Attached & Attached VC Sheet***

Final Reconciliation: The sales comparison analysis best reflects the values placed on properties and was the only approach considered for this analysis.   *** See Additional Comments ***

## RECONCILIATION

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF November 30, 2001 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 246,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature   _Chet Buhrmann_ | Signature | ☐ Did ☐ Did Not |
| Name   Chet Buhrmann-Crt.Gen.App. | Name | Inspect Property |
| Date Report Signed   December 6, 2001 | Date Report Signed | |
| State Certification #   CG01316577   State   CO | State Certification #   State | |
| Or State License #   Certified General Appraiser   State   CO | Or State License #   State | |



## SKETCH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City | Nederland (Mail) | County | Boulder | State | CO | Zip Code | 80466 |
| Lender or Client | FNB Mortgage Company/HUD |



| SUMMARY | | SQ. FT. AREA | PERIMETER | AREA CALCULATION DETAILS | |
|---|---|---|---|---|---|
| Living Area | | | | First Floor | |
| First Floor | | 1224 | 152 | 38.5  X   27.5  = | 1058.7 |
| | | | | 34.5  X    0.1  = | 3.4 |
| Garage/Carport | | | | 16.5  X    9.8  = | 161.7 |
| Attached Garage | | 290 | 72 | Total | 1223.8 |

Rocky Mountain Appraisal Network

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City Nederland (Mail) | County Boulder |
| Lender or Client | FNB Mortgage Company/HUD |

State CO  Zip Code 80466



**FRONT VIEW OF SUBJECT PROPERTY**



**REAR VIEW OF SUBJECT PROPERTY**



**STREET SCENE OF SUBJECT PROPERTY**

Rocky Mountain Appraisal Network

# PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City | Nederland (Mail) | County Boulder | State CO |
| Lender or Client | FNB Mortgage Company/HUD | Zip Code 80466 |



**COMPARABLE #1**

755 West First Street
Nederland

| | |
|---|---|
| Price | $227,500 |
| Price/SF | 245.68 |
| Date | 01/19/2001 |
| Age | 1967/34 Years |
| Room Count | 7-2-.75 |
| Living Area | 926 |
| Value Indication | $240,800 |



**COMPARABLE #2**

49 Wildewood Drive
Nederland (Mail)

| | |
|---|---|
| Price | $285,000 |
| Price/SF | 259.09 |
| Date | 11/14/2001 |
| Age | 1997/4 Years |
| Room Count | 6-3-1.75 |
| Living Area | 1,100 |
| Value Indication | $246,700 |



**COMPARABLE #3**

250 Crestwood Court
Nederland (Mail)

| | |
|---|---|
| Price | $299,000 |
| Price/SF | 213.57 |
| Date | 03/27/2001 |
| Age | 1978/23 Years |
| Room Count | 6-2-1.50 |
| Living Area | 1,400 |
| Value Indication | $255,700 |

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City Nederland (Mail) | County Boulder State CO Zip Code 80466 |
| Lender or Client | FNB Mortgage Company/HUD |

## LOCATION MAP



Rocky Mountain Appraisal Network

## FLOOD MAP

| | |
|---|---|
| Borrower or Owner | Verna M. Golz |
| Property Address | 130 Beaver Creek Drive |
| City | Nederland (Mail) | County | Boulder | State | CO | Zip Code | 80466 |
| Lender or Client | FNB Mortgage Company/HUD |



Community-Panel Number
08013C 0484 F

Effective Date:
June 2, 1995

# Exhibit 2

# FIRST NATIONAL BANK

*Verna's Copy* ②

### 401 MAIN ST – PO BOX 1159
### LONGMONT, CO 80502

PHONE: 303-774-2932 (DON WILSON- DIRECT)

➜ FAX: 303-774-2933(FNB MORTGAGE-MAIN ST) ⬅

ATTN: DON WILSON (FNB MORTGAGE)

---

### FACSIMILE TRANSMITTAL SHEET

| TO: VERNA GOLZ | FROM: Don Wilson– dwilson@fnb-mortgage.com |
|---|---|
| COMPANY: | DATE: 12-7-1 |
| FAX NUMBER: 406-582-9477 | TOTAL NO. OF PAGES INCLUDING COVER: 6 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: Updated #'s and appraisal | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☑ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

Hi Verna

Please sign at the x's and fax
back to me – There are updated numbers
based on your appraisal – Will need to get
bids for the items on the "Notice to the
Homebuyer" plus a water test on the well.
Call me on monday + we can discuss the
bids and if you're driving home – please have a
safe trip!

Don
Wilson

IF YOU DO NOT RECEIVE ALL PAGES OF THIS TRANSMITTAL
PLEASE CALL 303-774-2932

# Reverse Mortgage Comparison - Selected Plans     ①

**From:**
**Don Wilson**
**FNB Mortgage**
**401 Main Street**
**Longmont, CO 80501**
**Phone: (303) 678-5551  Fax: (303) 774-2933**

Estimates For:

Verna Golz
130 Beaver Creek Drive
Nederland, CO 80466

Age Information:

| DOB | Nearest Age | Age |
|---|---|---|
| 5/4/26 | 76 | 75 |

Estimated Closing Date: Dec-20, 2001

| | FHA/HUD Monthly | FHA/HUD Annual |
|---|---|---|
| Initial Interest Rate | 3.73% | 4.33% |
| Expected Interest Rate | 6.42% | 7.02% |
| Interest Rate Cap | 13.73% | 9.33% |
| Monthly Service Fee | $30 | $30 |
| Estimated Home Value | $246,000 | $246,000 |
| Lending Limit | $239,250 | $239,250 |
| Percentage | 97.26% | 97.26% |
| Creditline Growth Rate | 4.23% | 4.83% |
| Max Principal Limit | $160,297.50 | $148,613.50 |
| Service Set-Aside | $4,233.49 | $4,020.29 |
| Available Principal Limit | $156,064.01 | $144,793.21 |
| Initial Mort. Ins. Prem. | $4,785.00 | $4,785.00 |
| Financed Origination Fee | $4,785.00 | $4,785.00 |
| Other Financed Costs | $1,700.00 | $1,700.00 |
| Net Principal Limit | $144,794.01 | $133,523.21 |
| Debt Payoff Advance | $8,000.00 | $8,000.00 |
| Tax & Ins. Set-Aside | $0.00 | $0.00 |
| Net Available to You | $136,794.01 | $125,523.21 |
| Cash Requested | $20,000.00 | $20,000.00 |
| Creditline Requested | $116,794.01 | $105,523.21 |
| Remaining Cash | $0.00 | $0.00 |
| | or | or |
| Potential Tenure Payments | $0.00 | $0.00 |

| | | |
|---|---|---|
| Financed Fees and Costs | $11,270.00 | $11,270.00 |
| Borrower Paid Costs | $0.00 | $0.00 |

X Verna M. Golz                    12:10-01
Verna Golz                          Date

## This Schedule /

| Additional Assumptions |
| --- |
| Age of Youngest Borrowe |
| Initial Cash Withdrawal: |
| Lien Payoffs: |

Notes: Actual interest char
Cash To Homeown
Available credit will

| Year | Age |
| --- | --- |
| 0 | 75 |
| 1 | 76 |
| 2 | 77 |
| 3 | 78 |
| 4 | 79 |
| 5 | 80 |
| 6 | 81 |
| 7 | 82 |
| 8 | 83 |
| 9 | 84 |
| 10 | 85 |
| 12 | 87 |
| 14 | 89 |
| 16 | 91 |
| 18 | 93 |
| 20 | 95 |
| 22 | 97 |
| 24 | 99 |
| 26 | 100 |

Vena Golz

Priency Financial Freedom Senior Funds

## Annually Adjustable Home Equity Conversion Mortgage (HECM) Loan
### (Estimated Amortization Schedule for Verna Golz)
### Assumes An Interest Rate of 4.330% And Home Price Appreciation of 4.0%

| | | |
|---|---|---|
| 75 | Financed Closing Costs: | $11,270.00 |
| $20,000.00 | Monthly Cash to Homeowner: | $0.00 |
| $8,000.00 | Monthly Servicing Fee: | $30.00 |

...ee and home value projections may vary from amounts shown and Loan Balance cannot exceed home value.
...r includes monthly cash, creditline draws and any tax and insurance payments made from set-aside.
...e less than projected if funds are withdrawn from the line-of-credit.

| Available Creditline | Beginning Balance | Creditline Draws | Service Fees | Accrued MIP | Accrued Interest | Ending Balance | Home Value | Retained Equity |
|---|---|---|---|---|---|---|---|---|
| $105,523 | $39,270 | $0 | $360 | $202 | $1,747 | $41,579 | $246,000 | $206,730 |
| $110,734 | $41,579 | $0 | $360 | $214 | $1,849 | $44,002 | $255,840 | $214,261 |
| $116,203 | $44,002 | $0 | $360 | $228 | $1,957 | $46,544 | $266,074 | $222,072 |
| $121,941 | $46,544 | $0 | $360 | $239 | $2,069 | $49,212 | $276,717 | $230,172 |
| $127,983 | $49,212 | $0 | $360 | $253 | $2,187 | $52,012 | $287,785 | $238,573 |
| $134,283 | $52,012 | $0 | $360 | $267 | $2,311 | $54,950 | $299,297 | $247,284 |
| $140,914 | $54,950 | $0 | $360 | $282 | $2,441 | $58,004 | $311,268 | $256,318 |
| $147,873 | $58,034 | $0 | $360 | $296 | $2,576 | $61,289 | $323,719 | $265,686 |
| $155,175 | $61,269 | $0 | $360 | $314 | $2,721 | $64,664 | $336,668 | $275,399 |
| $162,838 | $64,664 | $0 | $360 | $332 | $2,871 | $68,227 | $350,135 | $285,470 |
| $170,880 | $68,227 | $0 | $360 | $352 | $3,224 | $75,690 | $364,140 | $295,913 |
| $188,174 | $76,690 | $0 | $720 | $709 | $6,919 | $83,919 | $383,864 | $317,964 |
| $207,218 | $84,327 | $0 | $720 | $799 | $7,684 | $93,619 | $405,902 | $341,565 |
| $228,190 | $93,619 | $0 | $720 | $887 | $8,523 | $103,861 | $460,763 | $397,134 |
| $251,285 | $103,851 | $0 | $720 | $985 | $9,459 | $115,119 | $539,016 | $384,499 |
| $276,716 | $115,119 | $0 | $720 | $1,092 | $10,478 | $127,827 | $683,000 | $423,897 |
| $304,721 | $127,827 | $0 | $720 | $1,210 | $11,604 | $141,191 | $630,573 | $455,473 |
| $335,591 | $141,191 | $0 | $720 | $1,340 | $11,604 | $148,533 | $655,786 | $489,382 |
| $362,132 | | | $360 | $723 | $6,259 | | | $507,282 |

_Signature_  02-10-2_  Date

'v Corporation's Reverse Mortgage Analyzer. Copyright © 1989-2001  12/7/01 #1

Your Loan Advisor:
Don Wilson
FNB Mortgage
401 Main Street
Longmont, CO 80501
Phone: (303) 678-5551  Fax: (303) 774-2933

Prepared for Verna Golz                                    HUD Annual Program

## LOAN TERMS

| | |
|---|---|
| Age of Youngest Borrower: | 76 |
| Appraised Property Value: | $246,000 |
| Initial Interest Rate: | 4.33% |
| Monthly Advance: | $0.00 |
| Initial Draw: | $28,000.00 |
| Line of Credit: | $105,523.21 |
| Length of Term: | N/A |

## INITIAL LOAN CHARGE

| | |
|---|---|
| Other Closing Costs: | $6,485.00 |
| Mortgage Ins. Premium: | $4,785.00 |
| Annuity Cost: | $0.00 |

## MONTHLY LOAN CHARGE

| | |
|---|---|
| Monthly Servicing Fee: | $30.00 |
| Mortgage Insurance: | 0.5% Annually |

## OTHER CHARGES

| | |
|---|---|
| Shared Appreciation: | None |

## REPAYMENT LIMITS

Net Proceeds Estimated at
93% Of Projected Home Sal

## Total Annual Loan Cost Rate

| APPRECIATION RATE | DISCLOSURE PERIOD (Yrs.) | | | |
|---|---|---|---|---|
| | 2 | 6 | 11 | 15 |
| 0% | 12.31% | 7.49% | 6.39% | 6.03% |
| 4% | 12.31% | 7.49% | 6.39% | 6.03% |
| 8% | 12.31% | 7.49% | 6.39% | 6.03% |

The cost of any reverse mortgage loan depends on how long you keep the loan and how much your house appreciates in value. Generally, the longer you keep a reverse mortgage, the lower the total annual loan cost rate will be.

This table shows the estimated cost of your reverse mortgage loan, expressed as an annual rate. It illustrates the cost for four loan terms: 2 years, half of life expectancy for someone your age, that life expectancy, and 1.4 times that life expectancy. The table also shows the cost of the loan, assuming the value of your home appreciates at three different rates: 0%, 4% and 8%.

The total annual cost rates in this table are based on the total charges associated with this loan. These charges typically include principal, interest, closing costs, mortgage insurance premiums, annuity costs, and servicing costs (but not disposition costs — costs when you sell the home).

The rates in this table are estimates. Your actual cost may differ if, for example, the amount of your loan advances varies or the interest rate on your mortgage changes. You may receive projections of loan balances from counselors or lenders that are based on an expected average mortgage rate that differs from the initial interest rate.

### SIGNING AN APPLICATION OR RECEIVING THESE DISCLOSURES DOES NOT REQUIRE YOU TO COMPLETE THIS LOAN

_Verna M Golz_   12-10-01
Verna Golz          Date

# GOOD FAITH ESTIMATE - RESPA

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement which you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

12/7/01

## ESTIMATED CLOSING COSTS

| Line | Description | Amount |
|------|-------------|--------|
| 801 | Loan Origination Fee | $ 4,785.00 |
| 902 | Loan Discount Points | 0.00 |
| 903 | Appraisal Fee | 300.00 |
| 804 | Credit Report Fee | 29.00 |
| 905 | Lender's Inspection Fee | 0.00 |
| 906 | Service Set-asides | 4,020.29 |
| 907 | Administration Fee | 0.00 |
| 908 | Mortgage Broker Fee | 0.00 |
| 909 | Tax Service Fee | 0.00 |
| 810 | Processing Fee | 0.00 |
| 811 | Underwriting Fee | 200.00 |
| 1101 | Settlement or Closing Fee | 150.00 |
| 1102 | | 0.00 |
| 1103 | Delegated Funding | |
| 1104 | | 0.00 |
| 1105 | Document Preparation | 0.00 |
| 1106 | Notary Fee | 0.00 |
| 1107 | Attorney's Fee | 600.00 |
| 1108 | Title Insurance | 0.00 |
| 1109 | Assignment | |
| 1110 | | 75.00 |
| 1201 | Recording Fee | 0.00 |
| 1202 | City / County Tax / Stamps | 0.00 |
| 1203 | State Tax / Stamps | |
| 1204 | | 100.00 |
| 1301 | Survey Fee | 0.00 |
| 1302 | Pest Inspection | 25.00 |
| 1303 | Flood Certification | 23.00 |
| 1304 | Courier | |
| 1305 | Wire Fee | |

| | | |
|---|---|---|
| Estimated Closing Costs (f.) | $ | 10,307.29 |
| Discount (if Borrower pays) (h.) | | 0.00 |
| Total Closing Costs | $ | 10,307.29 |

## FNB MORTGAGE COMPANY

Don Wilson
1650 PACE STREET

LONGMONT, CO 80501
Phone: (303) 678-5561   Fax: (303) 678-5573

BORROWER(S): Verna Gotz

PROPERTY: 130 Beaver Creek Drive
Nederland, CO 80466

Loan Program: FHA
           1 Yr Arm - HECM

| | |
|---|---|
| Max Claim Amount $: | $235,260.85 |
| Expected Int Rate %: | 7.020 |
| Property Value: | $235,000.00 |
| Principal Limit: | $148,613.50 |
| Net Principal Limit: | $133,529.21 |
| LTV %: | 60.49 |

| | Description | Amount |
|---|-------------|--------|
| a. | Purchase price | $ 0.00 |
| b. | Alterations, improvements, repairs | 0.00 |
| c. | Land (if acquired separately) | 0.00 |
| d. | Refinance (debts to be paid off) | 8,044.00 |
| e. | Estimated Prepaid Items | 145.10 |
| f. | Estimated Closing Costs | 10,307.29 |
| g. | PMI, MIP, Funding Fee | 4,785.00 |
| h. | Discount (if Borrower will pay) | 0.00 |
| i. | Total costs (items a - h) | 23,281.39 |
| j. | Subordinate Financing | 0.00 |
| k. | Closing costs paid by Seller | 0.00 |
| l. | Application Deposit | 0.00 |
| | Earnest Money Deposit | 0.00 |
| m. | Loan Amount (base) | 148,613.50 |
| n. | PMI,MIP, Funding Fee Financed | 0.00 |
| o. | Loan Amt. with Mortgage Insurance | 148,613.50 |
| p. | Cash from / (to) Borrower | $ (125,332.11) |

## ESTIMATED PREPAID ITEMS

| Line | Description | | | Amount |
|------|-------------|---|---|--------|
| 901 | Interest for 5 days @ $29.02 | | $ | 145.10 |
| 902 | Mortgage Insurance Premium | | | 4,785.00 |
| 903 | Hazard Insurance Premium | | | 0.00 |
| 904 | Flood Insurance Premium | | | 0.00 |
| 905 | VA Funding Fee/HUD MIP | | | 0.00 |
| 1001 | Hazard Insurance | 0 | Mths | 0.00 |
| 1002 | Mortgage Insurance | 0 | Mths | 0.00 |
| 1003 | | 0 | Mths | 0.00 |
| 1004 | Property Taxes | 0 | Mths | 0.00 |
| 1005 | Association Dues | 0 | Mths | 0.00 |
| 1006 | Flood Insurance | 0 | Mths | 0.00 |
| 1007 | | | | 0.00 |
| 1008 | Aggregate Escrow | | | |

| | | |
|---|---|---|
| Estimated Prepaid Items (e.) | $ | 145.10 |
| Prepaid PMI, MIP, Funding Fee | | 4,785.00 |
| Total Prepaid Items | $ | 4,930.10 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA).

# Exhibit 3

PHA#052-1965070
File No. 01KG0801

Condition Response

Borrower or Owner  Verna M. Golz
Property Address  130 Beaver Creek Drive
City  Nederland (Mail)  County  Boulder  State  CO  Zip Code  80466
Lender or Client  FNB Mortgage Company/HUD

To whom it may concern,

At the request of the lender, the following information is being provided with regard to the original appraisal report No. 01KG0801, FHA#052-1965070, for the subject property located at 130 Beaver Creek Drive in Nederland, Colorado. An opinion of value for the site only is estimated at $95,000, based on the sales comparision method of valuation. The estimated site value exceeds 30% of the total opinion of value for the subject property which is typical in the Boulder County market.

The well is located on the north side of the house and the septic to the east approximatly 150 feet away.

Comp 2 is located roughly 1 1/2 miles southeast of the subject property. The subject is not located directly in the Town of Nederland, therefore it is typical to expand the search for comparables to beyond the typical 1-mile radius. In this case, there were few resales of ranch style homes with similar square footage and on similar acreage within the Nederland area. The comparables used in this analysis were the best available in this market.

Lastly, title works shows a second lot owned by Ms. Verna Golz. That lot is Lot 2, Beaver Valley Estates, and is approximately 1 acre. It is separate from the appraised property, Lot 19, Beaver Valley Estates, which is approximately 1 acre and has the 1,224 square foot home located there. The lots have never been joined and have separate parcel numbers and tax identification numbers.

Cher Buhrmann-Certified General Appraiser
CG01316577, Exp. 12/31/2002

## Complete Appraisal Analysis - Summary Appraisal Report
### UNIFORM RESIDENTIAL APPRAISAL REPORT

FHA#052-1965070
File No. 01KG0801

**Valuation Section**

| | |
|---|---|
| ESTIMATED SITE VALUE ........................................=$ | 95,000 |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | |
| Dwelling _____ Sq. Ft.@ $ _____ =$ | N/A |
| _____ Sq. Ft.@ $ _____ =$ | N/A |
| Garage/Carport _____ Sq. Ft.@ $ _____ =$ | N/A |
| Total Estimated Cost New _____ =$ | N/A |
| Less  Physical  Functional  External | |
| Depreciation _____ =$ | |
| Depreciated Value of Improvements .........................=$ | N/A |
| "As-is" Value of Site Improvements .........................=$ | N/A |
| INDICATED VALUE BY COST APPROACH ...................=$ | 95,000 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): Site value is estimated by the sales comparison method of valuation. No functional or external depreciation noted. Physical depreciation is noted and relates to the age of the subject property. The subject conforms to minimum HUD standards. Because of the age of the subject property, the cost approach was not considered in the analysis. Therefore, the jurisdictional exception rule is applied in this case.  ***See Attached Sketch***

Remaining Economic Life: 45 Remaining Physical Life: 45

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 130 Beaver Creek Drive Nederland (Mail) | 755 West First Street Nederland | 49 Wildewood Drive Nederland (Mail) | 250 Crestwood Court Nederland (Mail) |
| Proximity to Subject | | 1/2 Mile Southeast Of Subject | 1 1/2 Miles Southeast Of Subject | 2 Blocks Northwest Of Subject |
| Sales Price | Reverse Mortgage | $ 227,500 | $ 285,000 | $ 299,000 |
| Price/Gross Liv. Area | $ 200.98 ☑ | $ 245.68 ☑ | $ 259.09 ☑ | $ 213.57 ☑ |
| Data and/or Verification Source | County Records Inspection | MLS/Realtor DOM: 96 MLS# 242137 Listed: 10/2000 | MLS/Realtor DOM: 52 MLS# 318554 Listed: 9/2001 | MLS/Realtor DOM: 58 MLS# 248031 Listed: 1/2001 |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing Concessions | | Conventional No Seller Points | | Conventional No Seller Points | | Conventional No Seller Points | |
| Date of Sale/Time | | 01/19/2001 Closed | | 11/14/2001 Closed | | 03/27/2001 Closed | |
| Location | Beaver Valley Est/Avg | Nederland/Avg | -0- | Big Springs/Avg | -0- | Beaver Valley Est/Avg | -0- |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1.02 Acres | 1.25 Acres | | 1 Acre | -0- | 1.90 Acres | -20,000 |
| View | Mountains | Mountains | -0- | Mountains | -0- | Mountains | -0- |
| Design and Appeal | Ranch/Average | Two Story/Average | -0- | Ranch/Average | -0- | Two Story/Average | -0- |
| Quality of Construction | Wood/Frame/Average | Wood/Frame/Average | | Wood/Frame/Good | -20,000 | Wood/Frame/Average | -0- |
| Age | 1963/38 Years | 1967/34 Years | -0- | 1997/4 Years | -0- | 1978/23 Years | -0- |
| Condition | Average | Average | | Good | -20,000 | Average | -0- |
| Above Grade | Total  Bdrms  Baths | Total  Bdrms  Baths | | Total  Bdrms  Baths | | Total  Bdrms  Baths | |
| Room Count | 7   1   1.00 | 7   2   .75 | -0- | 6   3   1.75 | -1,500 | 6   2   1.50 | -1,000 |
| Gross Living Area | 1,224 Sq. Ft. | 1,224 Sq. Ft. | +500 | 1,100 Sq. Ft. | +8,900 | 1,400 Sq. Ft. | -5,300 |
| Basement & Finished Rooms Below Grade | 415 SF None N/A | Unfinished | -2,100 | None | +3,700 | None | |
| Functional Utility | Typical | Typical | | N/A Typical | | N/A Typical | |
| Heating/Cooling | PFA/None | BBB/None | +2,000 | PFA/Non | -0- | Typical | |
| Energy Efficient Items | Typical | Typical | | Typical | | PFA/Ceiling Fans | -0- |
| Garage/Carport | 1 Car Attached | None | +2,500 | 2 Car Detached | -2,500 | None | +2,500 |
| Porch, Patio, Deck, Fireplace(s), etc. | Stoop, None Fireplace/Wood Stove | Stoop, Deck Fireplace/None | -500 +2,000 | Stoop, Decks None | -1,000 +3,000 | Stoop, Dock None/Wood Stove | -500 +1,000 |
| Fence, Pool, etc. | Fencing | Fencing | | Fencing | | Fencing | |
| Additional Features | Sleeping Loft | None | -0- | Garage Loft | -0- | None | -0- |
| Net Adj. (total) | | ☐ + ☒ - $ | 13,300 | ☐ + ☒ - $ | -38,300 | ☐ + ☒ - $ | -43,300 |
| Adjusted Sales Price of Comparable | | Gross 8.1% Net 5.8% $ | 240,800 | Gross 18.1% Net -13.4% $ | 246,700 | Gross 16.8% Net -14.5% $ | 255,700 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): All comps sold within 12 months from the effective date of this appraisal. Comps 1 and 2 are slightly older, but were included because of their similarity to the subject property and because of a lack of similar resales in this small mountain town. Financing was similar and typical of today's market, no adjustment was necessary.  ***See Additional Comments***

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | No previous sale past 1 year, per county records. | No previous sale in the past 1 year, except noted, per MLS | No previous sale in the past 1 year, except noted, per MLS | No previous sale in the past 1 year, except noted, per MLS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: There is currently no known agreement of sale, option or listing of the subject or comparables used in the preparation of this report.  ***See USPAP Compliance Addendum.***

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH ....................................................=$ | 246,000 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ _____/Mo. x Gross Rent Multiplier _____ =$ | N/A |

This appraisal is made ☐ "as is"  ☐ subject to the repairs, alterations, inspections or conditions listed below  ☒ subject to completion per plans and specifications.

Conditions of Appraisal: The subject property has been appraised "subject to completion of specified repairs." ***See Certification and Statement of Limiting Conditions Attached & Attached VC Sheet***

Final Reconciliation: The sales comparison analysis best reflects the values placed on properties and was the only approach considered for this analysis.  ***See Additional Comments***

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF  November 30, 2001
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $  246,000

| | |
|---|---|
| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
| Signature | Signature |
| Name  Chet Buhrmann-Crt.Gen.App. | Name |
| Date Report Signed  December 6, 2001 | Date Report Signed |
| State Certification #  CG01316577 / State CO | State Certification # _____ State _____ ☐ Did ☐ Did Not Inspect Property |
| Or State License #  Certified General Appraiser  State CO | Or State License # _____ State _____ |

Fdie Mae Form 70  6-93                                    12 CH.                                    Fannie Mae Form 1004  6-93

PAGE 2 OF 2

Rocky Mountain Appraisal Network

Exhibit 4

RECORD AND RETURN TO:
FINANCIAL FREEDOM SENIOR FUNDING CORPORATION
7840 ROSWELL ROAD BUILDING 300 SUITE 340
ATLANTA, GEORGIA 30350



I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT

8-1

---

[Space Above This Line For Recording Data]

---

State of Colorado

FHA Case No.  052-1965070/255
7002937-7111

# ADJUSTABLE RATE
# HOME EQUITY CONVERSION DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on  JANUARY 18, 2002                , among the grantor
VERNA M. GOLZ, A SINGLE PERSON

whose address is   130 BEAVER CREEK DRIVE,
NEDERLAND, COLORADO 80466
                                                                                    ("Borrower"),
the Public Trustee of  BOULDER                            County ("Trustee") and the beneficiary,
FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF LEHMAN BROTHERS
BANK, FSB
organized and existing under the laws of  THE STATE OF DELAWARE          , and whose address is
7840 ROSWELL ROAD BUILDING 300 SUITE 340, ATLANTA, GEORGIA 30350
                                                    ("Lender"). Borrower has agreed to repay to Lender
amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity
Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement
to repay is evidenced by Borrower's Note dated the same date as this Security Instrument ("Note"). This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest at a rate subject
to adjustment, and all renewals, extensions and modifications of the Note, up to a maximum principal amount of
THREE HUNDRED SIXTY NINE THOUSAND AND 00/100 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
(U.S. $ 369,000.00           ); (b) the payment of all other sums, with interest, advanced under Paragraph 5 to
protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and
(c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  The
full debt, including amounts described in (a), (b), and (c) above, if not paid earlier, is due and payable on
MAY 04            , 2076. For this purpose, Borrower, in consideration of the debt and the trust herein created,
irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in
BOULDER                County, Colorado:

66XB : 09/97          FIRST AMERICAN          Page 1 of 8

HERITAGE TITLE

JD 776 08 B01

PARCEL A: LOT 2, BEAVER VALLEY ESTATES, PARCEL B: LOT 19, BEAVER VALLEY ESTATES, COUNTY OF BOULDER, STATE OF COLORADO.

8- *v*

which has the address of   130 BEAVER CREEK DRIVE

[Street]

NEDERLAND          ,          COLORADO          80466          ("Property Address");
[City]                                   [State]                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

2. **Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

3. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender instead of to Borrower and to Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be

02XA : 11/96                              Page 2

lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

4. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument, and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

5. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

6. **Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

7. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

03XA : 11/86                              Page 3

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

(a) **Due and Payable.** Lender may require immediate payment in full of all sums secured by this Security Instrument if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).

(b) **Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval of the Secretary, if:

(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(ii) For a period of longer than twelve (12) consecutive months, a Borrower fails to occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii) An obligation of the Borrower under this Security Instrument is not performed.

(c) **Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in this Paragraph (a) (ii) or (b) occur.

(d) **Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9 (a) (ii) or (b). Lender shall not have the right to commence foreclosure until Borrower has had thirty (30) days after notice to either:

(i) Correct the matter which resulted in the Security Instrument coming due and payable; or

(ii) Pay the balance in full; or

(iii) Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

(iv) Provide the Lender with a deed in lieu of foreclosure.

(e) **Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

(f) **Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within  SIXTY DAYS               from the date hereof, if permitted by applicable law Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to    SIXTY DAYS            from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment in full. Foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure

04XA : 11/96                                      Page 4

proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. Lien Status.**

(a) **Modification.** Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

(b) **Tax Deferral Programs.** Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

(c) **Prior Liens.** Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**13. Relationship to Second Security Instrument.**

(a) **Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

(b) **Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the Note unless:

(i) This Security Instrument is assigned to the Secretary; or

(ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

(c) **Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment in full of all outstanding principal and accrued interest under the Second Note; or

(ii) Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

05XA : 11/98                                    Page 5

(d) No Duty of the Secretary. The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

14. Forbearance by Lender Not a Waiver. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

15. Successors and Assigns Bound; Joint and Several Liability. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

16. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

17. Governing Law; Severability. This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

18. Borrower's Copy. Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

19. Assignment of Rents. Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

20. Foreclosure Procedure. If Lender requires immediate payment in full under Paragraph 9, Lender may invoke the power of sale and any other remedies permitted under applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Paragraph 16. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by applicable law and shall mail copies of the notice of sale in the manner prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. After the time required

by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

21. **Lien Priority.** The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priory of any liens for unpaid State or local governmental unit special assessments or taxes.

22. **Adjustable Rate Feature.** Under the Note, the initial stated interest rate of    4.2300 % which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board in Statistical Release H.15 (519) ("Index") plus a margin. If the Index is no longer available, Lender will use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice of the new Index.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on the first day of   FEBRUARY, 2003       , and on  ☒ that day of each succeeding year ☐ the first day of each succeeding month ("Change Date") until the loan is repaid in full.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

☒ (Annually Adjusting Variable Rate Feature) The Calculated Interest Rate cannot be more than 2.0% higher or lower than the Existing Interest Rate, nor can it be more than 5.0% higher or lower than the Initial Interest Rate.

☐ (Monthly Adjusting Variable Rate Feature) The Calculated Interest Rate will never increase above
                                          percent (        %).

The Calculated Interest Rate will be adjusted if necessary to comply with these rate limitation(s) and will be in effect until the next Change Date. At any Change Date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

23. **Lender in Possession.** Upon acceleration under Paragraph 9 or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument.

24. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

25. **Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es).]

☐ Condominium Rider  ☐ Shared Appreciation Rider  ☐ Planned Unit Development Rider
☐ Other (Specify)

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (Seal)
VERNA M. GOLZ                    -Borrower

_____ (Seal)
                                 -Borrower

—————————————— [Space Below This Line For Acknowledgment] ——————————————

STATE OF COLORADO                          BOULDER COUNTY SS:

The foregoing instrument was acknowledged before me this  JANUARY 18, 2002          , by
VERNA M. GOLZ

Witness my hand and official seal.

_____
Notary Public

My commission expires: _____9/22/03_____

91XB : 05/97                    Page 8 of 8

Exhibit 5

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. TYPE OF LOAN: 1. ☐ FHA  2. ☐ FmHA  3. ☐ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. |
|---|---|
| | 6. FILE NUMBER:  7. LOAN NUMBER: 7062927-7111 |
| | 8. MORTGAGE INSURANCE CASE NUMBER: 652-1955070/255 |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

**D. NAME AND ADDRESS OF BORROWER:**
VERNA M. GOLZ

138 BEAVER CREEK DRIVE, NEDERLAND, COLORADO 80466

**E. NAME AND ADDRESS OF SELLER:**
N/A                    MAXIMUM PRINCIPAL AMOUNT $309,006.00

**F. NAME AND ADDRESS OF LENDER:**
FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF LEHMAN BROTHERS BANK, FSB
7840 ROSWELL ROAD BUILDING 300 SUITE 340, ATLANTA, GEORGIA 30350

**G. PROPERTY LOCATION:**
138 BEAVER CREEK DRIVE, NEDERLAND, COLORADO 80466

**H. SETTLEMENT AGENT:**  FIRST AMERICAN HERITAGE

| I. SETTLEMENT DATE: | PLACE OF SETTLEMENT: |
|---|---|
| LOAN CLOSING DATE  JANUARY 18, 2002 | 635 S. SUNSET, SUITE A |
| DISBURSEMENT DATE  JANUARY 24, 2002 | LONGMONT, COLORADO 80501 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 11,237.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. COMMUNITY FEDERAL BANK | 7,942.23 | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. ORIGINATION FEE - CASH | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 19,179.73 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. CLOSING COSTS | 11,237.50 | 504. Payoff of first mortgage loan | |
| 205. CASH PORTION OF INITIAL DRAW | 20,000.00 | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. REFUND FOR APP FEES | | 508. | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid by seller* | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. COMMUNITY FEDERAL BANK | 7,942.23 | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 19,179.73 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross amount due from borrower (line 120) | 19,179.73 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | ( 39,179.73 ) | 602. Less reductions in amount due seller (line 520) | ( ) |
| 303. CASH ( ☐ FROM / ☐ TO ) BORROWER | 20,000.00 | 603. CASH ( ☐ TO / ☐ FROM ) SELLER | ( ) |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pages 1 and 2).

| _VERNA M. GOLZ_          01/18/02 . | |
|---|---|
| Borrower                    Date | Seller                    Date |
| Borrower                    Date | Seller                    Date |

WARNING:  It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

## L. SETTLEMENT CHARGES

| | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION:** | | | | | |
| based on price $ | @ | %= | | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. $ | to | | | | |
| 702. $ | to | | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801. Loan Origination Fee | % | FNB MTG | | 4,929.80 | ✓ |
| 802. Loan Discount | % | | | | |
| 803. Appraisal Fee | to | ROCKY MOUNTAIN APPR. | | 400.00 | ✓ |
| 804. Credit Report | to | FACTUAL DATA | | 23.50 | ✓ |
| 805. Lender's Inspection Fee | | | | | |
| 806. Mortgage Insurance Application Fee | to | | | | |
| 807. Assumption Fee | | | | | |
| 808. REPAIR ADMINISTRATION FEE TO FFSFC | | | | 60.00 | |
| 809. COURIER FEE TO | | | | | |
| 810. FLOOD CERT TO FOSFNB MORTGAGE | | | | 18.00 | |
| 811. WIRE FEE TO FFSFC | | | | 20.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901. Interest From | | @ $ | /day | | |
| 902. Mortgage Insurance Premium for | 2.80000 to | HUD | | 4,929.80 | ✓ |
| 903. Hazard Insurance Premium for | years to | | | | |
| 904. | years to | | | | |
| 905. TAX SERVICE FEE TO | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | | |
| 1002. Mortgage Insurance | months @ $ | per month | | | |
| 1003. City Property Taxes | months @ $ | per month | | | |
| 1004. County Property Taxes | months @ $ | per month | | | |
| 1005. Annual Assessments | months @ $ | per month | | | |
| 1006. | months @ $ | per month | | | |
| 1007. | months @ $ | per month | | | |
| 1008. | months @ $ | per month | | | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement or closing fee | to | FIRST AMERICAN HERITAGE | | 125.00 | |
| 1102. Abstract or title search | to | | | | |
| 1103. Title examination | to | | | | |
| 1104. Title insurance binder | to | | | | |
| 1105. Document preparation (see Note below) | to | FAND | | 90.00 | |
| 1106. Notary fees | to | | | | |
| 1107. Attorney's fees | to | | | | |
| (includes above items numbers: | | | ) | | |
| 1108. Title Insurance | to | FIRST AMERICAN HERITAGE | | 578.00 | |
| (includes above items numbers: | | | ) | | |
| 1109. Lender's coverage | $ | 246,000.00 | | | |
| 1110. Owner's coverage | $ | | | | |
| 1111. | | | | | |
| 1112. | | | | | |
| 1113. CORRESPONDENT FEE (POC $450) | | | | | |
| Note: The overall fee may also include item 1107 | | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording fees: Deed $ | ; Mortgage $ | 90.00 | ; Releases $ | 90.00 | |
| 1202. City/county tax/stamps | Deed $ | | ; Mortgage $ | | |
| 1203. State tax/stamps | Deed $ | | ; Mortgage $ | | |
| 1204. | | | | | |
| 1205. | | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey | to | | | | |
| 1302. Pest Inspection | to | | | | |
| 1303. | | | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | | | | 11,237.50 | |

HUD-1-84/87

I have prepared the HUD-1 Settlement Statement.

_____     By: _____
Company                                   Representative                Date

The HUD-1 Settlement Statement is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

FIRST AMERICAN HERITAGE             By: _____
Settlement Agent                          Representative                Date

# ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

## CERTIFICATION OF BORROWER IN AN FHA-INSURED HECM
### (HOME EQUITY CONVERSION MORTGAGE) LOAN TRANSACTION

I have carefully reviewed the HUD-1 Settlement Statement, and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____                                    _____
VERNA M. GOLZ                                                                                                      -Borrower

_____                                    _____
                                                                                                                             -Borrower

_____                                    _____
                                                                                                                             -Borrower

_____                                    _____
                                                                                                                             -Borrower

Date: _____

## CERTIFICATION OF SETTLEMENT AGENT IN AN FHA-INSURED HECM
### (HOME EQUITY CONVERSION MORTGAGE) LOAN TRANSACTION

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction.

_____          _____
Settlement Agent                                                              Date

[The certifications contained herein may be obtained from the respective parties at different times or may be obtained on separate addenda.]

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details, see Title 18 U.S. Code Sections 1001 and 1010.

XA00 : 12/01

# Exhibit 6





3

WHEN RECORDED MAIL TO
Financial Freedom Acquisition LLC
Meredith Lucero
(Claims & Assignments)
2900 Esperanza Crossing
Austin, TX 78759

PREPARED BY Kathy Honeycutt
Telephone Number (512) 918-7557
FHA Loan Number 052-1965070
MERS MIN No  100854900070029372
PIN# R0023853

## CORPORATION ASSIGNMENT OF DEED OF TRUST
### [MERS/FF TO FHA]

For value received  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS  INC  ( MERS )  A DELAWARE CORPORATION  ITS SUCCESSORS OR ASSIGNS  AS NOMINEE FOR FINANCIAL FREEDOM  A DIVISION OF ONEWEST BANK FSB  2900 ESPERANZA CROSSING  AUSTIN  TEXAS  78758  ( FF )  does hereby grant  sell assign  transfer and convey  unto the SECRETARY OF HOUSING AND URBAN DEVELOPMENT (451 7TH Street SW  Washington  DC  20410) ( Assignee )  all of FF s right  title and interest in  to and under the DEED OF TRUST dated JANUARY 18  2002 and executed by VERNA M GOLZ  A SINGLE PERSON  to and in favor of FINANCIAL FREEDOM SENIOR FUNDING CORPORATION  A SUBSIDIARY OF LEHMAN BROTHERS BANK  FSB  and recorded on JANUARY 25  2002  in BOULDER County  State of COLORADO  document number 2246751 (the DEED OF TRUST')  which encumbers property described on Exhibit A  attached hereto and incorporated herein by this reference
Property address  130 BEAVER CREEK DRIVE, NEDERLAND, COLORADO  80466
TOGETHER WITH the note(s) described or referred to in the DEED OF TRUST  the money due or to become due thereon with interest  and all rights accrued or to accrue under said DEED OF TRUST
THE FOREGOING ASSIGNMENT IS MADE WITHOUT RECOURSE OR WARRANTY BY FF  except that FF hereby warrants that  (a)  no act or omission of FF has impaired the validity and priority of the said security instruments  (b) the security instrument is a good and valid first lien and is prior to all mechanics  and materialmen s liens filed of record regardless of when such liens attach  and prior to all liens  encumbrances  or defects which may arise except such liens or other matters as have been approved by the Assignee hereunder  (c) the sum of $369 000 00 together with the interest from the 18th day of JANUARY  2002  at the rate of 4 230%  computed as provided in the credit instrument  is actually due and owing under the said credit instrument and (d)  FF has a good right to assign the said security and credit instruments
IN WITNESS WHEREOF  the undersigned has executed this Corporation Assignment of DEED OF TRUST on December 9  2011

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS  INC  AS NOMINEE FOR
FINANCIAL FREEDOM  A DIVISION OF ONEWEST BANK  FSB

By
Name     V LYN NILES                                Title  ASSISTANT SECRETARY

STATE OF TEXAS
COUNTY OF TRAVIS
On December 9, 2011  before me  BILLIE ANN ALFEREZ  a notary public in and for TRAVIS County  in the State of TEXAS  personally appeared  V LYN NILES  ASSISTANT SECRETARY for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS  INC  AS NOMINEE FOR FINANCIAL FREEDOM  A DIVISION OF ONEWEST BANK FSB  C/O 2900 ESPERANZA CROSSING  AUSTIN  TEXAS 78758  personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that She executed the same in her authorized capacity  and that by her signature on the instrument the person  or entity upon behalf of which the person acted executed the instrument
WITNESS my hand and official seal

Signature

BILLIE ANN ALFEREZ
Notary Public  State of Texas
My Commission Expires
December 02 2013

R2B



EXHIBIT "A"

PARCEL A  LOT 2, BEAVER VALLEY ESTATES, PARCEL B  LOT 19, BEAVER VALLEY
ESTATES, COUNTY OF BOULDER, STATE OF COLORADO

golz

C\CJ2433680\199082292_0007002937

03042520  11/18/2009 09 26 AM
RF $6 00    DF $0 00    Page 1 of 1
Electronically recorded in Boulder County Colorado
Recorded as received

*600061585*

*FL093C*

WHEN RECORDED RETURN TO
Financial Freedom
C/O NTC 2100 Alt 19 North
Palm Harbor FL 34683
Loan # 0007002937
Effective Date 05/01/2009

## CORPORATE ASSIGNMENT OF DEED OF TRUST

FOR GOOD AND VALUABLE CONSIDERATION the sufficiency of which is her by acknowledg d, the undersigned FINANCIAL FREEDOM SENIOR FUNDING CORPORATION A SUBSIDIARY OF LEHMAN BROTHERS BANK FSB, WHOSE ADDRESS IS 190 TECHNOLOGY PARKWAY SUITE 100 NORCROSS, CA 30092 by these presents does convey grant, sell, assign, transfer and set over the described deed of trust together with the certain note(s) described therein together with all interest secured thereby all liens and any rights due or to become due thereon to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC (MERS) A DELAWARE CORPORATION ITS SUCCESSORS OR ASSIGNS AS NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC PO BOX 2026 FLINT MI 48501 2026 (ASSIGNEE) [FINANCIAL FREEDOM ACQUISITION LLC 190 TECHNOLOGY PARKWAY SUITE 100 NORCROSS, CA 30092]

S xl D. d m d. by VERNA M GOLZ dated 01/18/2002, and r corded in Book page and or Inst/Film Number 7246751 in th office of th R corder of BOULDER County Colorado

THE FOREGOING ASSIGNMENT IS MADE WITHOUT RECOURSE REPRESENTATION OR WARRANTY EXPRESS OR IMPLIED BY

dated 11/17/2009
FINANCIAL FREEDOM SENIOR FUNDING CORPORATION A SUBSIDIARY OF LEHMAN BROTHERS BANK FSB

Dhurata Doko  Vice President

STATE OF FLORIDA        COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me THIS 17TH DAY OF NOVEMBER IN THE YEAR 2009 by DHURATA DOKO personally known to me to be the VICE PRESIDENT of FINANCIAL FREEDOM SENIOR FUNDING CORPORATION A SUBSIDIARY OF LEHMAN BROTHERS BANK FSB a corporation, on behalf of the corporation

Crystal Moore  Notary Public
Comm Expires Sept 23 2013

CRYSTAL MOORE
Notary Public  State of Florida
My Comm Expires Sep 23 2013
Commission # DD 627242

Prep by Jes ica Fretwell/NTC 2100 Alt 19 North Palm Harbor Fl 34683 (800)346-9152
FF  A 10276133  N  MIN 100854900007002937  MERS PHONE 1 888 679 MERS  form5/EFRMCON1

10276133

# Exhibit 7

**To:** THE HONORABLE JULIÁN CASTRO
US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
451 7TH STREET SW
WASHINGTON, DC 20410

**VIA:** CERTIFIED MAIL NO. 7013 2630 0000 8675 5292

**CC:** HELEN R KANOVSKY, ESQ
HELEN.R.KANOVSKY@HUD.GOV

IVERY W HIMES
IVERY.W.HIMES@HUD.GOV

**VIA:** EMAIL

**CC:** MARY ELLEN SPIECE, ESQ
JON KITCHEL, ESQ

**FROM:** WILLIAM GOLZ, PHD
29714 N 152ND WAY
SCOTTSDALE, AZ 85262-6942
WGOLZ@ALUMNI.LSU.EDU

**RE:** HECM LOAN:

|  |  |
|---|---|
| BORROWER | VERNA M GOLZ |
| PROPERTY | 130 BEAVER CREEK DRIVE |
|  | NEDERLAND, CO 80466 |
| FUNDED DATE | 01/24/2002 |
| FHA CASE NO. | 052-1965070 |

**DATE:** JANUARY 18, 2015

Dear Secretary Castro:

This is to follow up on my January 8, 2015 letter to you with references to documentation which I hope will help illuminate for you the hardship my mother experienced in living with an inadequate well, the extraordinary effort she invested in trying to avail herself of the means to drill a new well, and the failure that greeted her efforts as a consequence of her vacant lot having been improperly encumbered on the Deed of Trust for her Home Equity Conversion Mortgage (HECM) loan.

My mother's home was built in 1965 by Wes and Rita Weller, two of the developers of Beaver Valley Estates. This was a time when the population density in the Rocky Mountains was low and government oversight of building in unincorporated areas of Boulder County was minimal. My mother's was the first home in the valley and remains the only one served by a hand-dug well (which depends upon the shallow water table supported by Beaver Creek). By 2004, an ongoing drought plus 40 years of upstream development which had brought a permanent change to the valley's hydrogeological conditions became manifest as a receding water table which was causing my mother's well to run periodically dry.

For assistance, my mother turned to Karen Hoover, Community Care Coordinator for the Nederland Area of Boulder County Aging Services Division. Ms. Hoover's letter of June 21, 2004 to the United States Department of Agriculture (USDA), which accompanied the application she submitted for Rural Development grant and loan assistance for my mother, stated:

(p. 1, par. 2) Ms. Golz is 78 years old. Her sole source of income is Social Security. To supplement her income she has obtained a reverse mortgage and uses a line of credit to draw down payments when required to meet her living expenses.

(pp.1-2, par. 3) ...major expenditures are required for the following health and safety repairs to her home:

--Due to a shrinking water table, a new well is required... At this time Ms. Golz is hauling her drinking and cooking water in gallon jugs. She is bathing at the Nederland health club (necessitating payment of a monthly membership fee).

--The septic tank was damaged when it was driven over by the truck that came to pump it out... She actively pursued a settlement from the company for repairs but was eventually told by them that she would need to take them to small claims court to obtain any payment.

--The electrical wiring is 33 years old... She would feel more secure if an electrician evaluated her wiring and any necessary safety modifications were made.

--The garage door needs to be replaced, as does a storm door on the house.

--Shingles need to be replaced on the roof.

--The toilet is malfunctioning and she would like to replace it with a low-flow model.

(p 2) Enclosures: Uniform Residential Loan Application

Pursuant to Ms. Hoover's letter, Boyd Sheets from Boulder County's Division 1 of Water District 6 inspected my mother's hand-dug well and forwarded his Field Inspection Report dated July 13, 2004 to the Office of the State Engineer, Colorado Division of Water Resources (DWR). My mother paid fees of $480 to DWR for a Permit to Construct a Well (No. 258451) which was issued on July 29, 2004 and expired on July 29, 2006.

Records show that during summer and fall of 2004 my mother obtained bids from well drillers and other contractors for the repairs listed above. Ms. Hoover submitted the selected bids to Mr. Bob Miller at USDA Rural Development in Greeley, Colorado (USDA-Greeley). A letter dated January 13, 2005 from Ms. Linda Rousselle of USDA-Greeley stated that my mother's application had been approved. Then, on March 4, 2005, my mother noted that USDA asked her to withdraw her application pursuant to their title search which revealed that a debt of $369,000 was secured on the Deed of Trust by "Parcel A: Lot 2 Beaver Valley Estates, Parcel B: Lot 19 Beaver Valley Estates." That secured debt exceeded the value of the underlying security thus violating USDA requirements for their second-lien position.[1]

In her March 28, 2005 letter to Ms. Rousselle, my mother expressed her disappointment:

> While I appreciate very much the efforts you and Bob Miller made on behalf of my application,... I also regret very much the effort that was required on my part to meet the USDA application requirements as well as the anxiety I experienced about the liens and title search fee... I would like to hear from you before I write to withdraw my application.

My mother's notes state that when she contacted the Department of Housing and Urban Development (HUD) to ask them to review her loan, the person with whom she spoke listened then explained that HUD policies did not allow them to contact the lender on my mother's behalf. HUD provided my mother with the phone number for Financial Freedom Senior Funding Corporation (Financial Freedom). After several calls to Financial Freedom, my mother was connected to a loan specialist who stated he had reviewed her file and found her loan to be "in compliance with all HUD lending guidelines." When my mother asked for a copy of everything in her file, the loan specialist told her it was legally privileged information and she would need to have an attorney request it in writing from Financial Freedom's corporate counsel, whose address my mother recorded in her notes.

My mother met again with Ms. Hoover and with the Boulder County Housing Authority. Mr. Christopher Hudak, Housing Counseling Coordinator, sent my mother a letter dated December 2, 2005 to follow up on her counseling session. My mother's notes indicate that when HUD was called their response was that my mother's HECM loan file was not in their possession and that HUD could not intervene with

---

[1] For a property valuation analysis, see my letter to you of November 8, 2014, pp. 1, 2.

the lender or interfere with a "valid Deed of Trust." My mother's handwritten notes on a Boulder County Housing Authority envelope with postage metered December 5, 2005 may help you understand how dispiriting the prior year and a half had been for her:

> *Letter from Linda USDA Re. canceling Loan & Grant. The long Co. drought has caused the well to go dry. Reverse mortgage was conceived to help seniors — realize a modicum of a hopeful lifestyle.*

In May 2011, my mother retained an attorney in Nederland, Mr. Mark Cohen, whose office communicated with HUD and Mr. Michael Miller, Lien Release Specialist at One West Bank, successor to Financial Freedom. Mr. Miller's initial response was that he would verify the facts and, if Mr. Cohen was correct in his assertions, advise his employer to release Lot 2. By the end of June, Mr. Miller had stopped returning Mr. Cohen's emails and telephone calls. On July 1, 2011, Mr. Cohen filed Case No. 11cv6836 in Boulder County Court in the matter of Verna Mae Golz v Financial Freedom and One West Bank. One West Bank and the Secretary of HUD released their liens on July 20.[2]

In summary of the key facts: a lender-requested addendum to the appraisal report for the subject property identified Lot 2 as vacant land, separate from the residential property, Lot 19, whose appraised value alone had been used to determine the loan's principal limits.[3] With disregard for the appraisal and the addendum, the loan officer and reverse mortgage specialist at FNB Mortgage Company, Longmont who originated the loan encumbered Lot 2 as security on the Deed of Trust (for the lender's and HUD's benefit, in apparent violation of various state and federal laws and without disclosure on the settlement statement). As a consequence of that improper lien, my mother was unable to obtain USDA assistance or sell Lot 2. Over the span of years in which my mother's pleas went unanswered, she suffered the personal hardship of an inadequate well and the economic costs of being deprived of the ownership of her property only to then have to invest thousands of dollars to file suit to have the lender and the Secretary of HUD release liens whose impropriety would have been plain to anyone willing to undertake a cursory inspection of the loan documents.

The improprieties seem so conspicuous and the consequences to my mother so serious that I am writing with the respectful request that you address what oversight responsibility HUD could have exercised to review my mother's HECM loan documents to determine whether or not her loan was in compliance with HUD guidelines (including 2 USCS § 1715z-20) with regard to the inclusion of Lot 2 as security on the Deed of Trust.

Sincerely,



William Golz, PhD

---

[2] Ibid., p. 2, fn. 2.
[3] Ibid., pp. 1, 2.

## CERTIFICATE OF SERVICE .

I hereby certify that I will transmit the foregoing by U.S. mail for delivery to the Clerk of

Court whom will send notification of such filing to any party who has entered an appearance in

this matter to the email addresses on file with CM/ECF. I hereby further certify that I will send the

foregoing to the following, named, non-CM/ECF participants (via the manner indicated in

parentheses):

> Marcus J. Golz (U.S. Mail and email)
> 552 Hillsdale Street
> Helena, Montana 59601
> golzmj@gmail.com
>
> Matthew J. Golz (U.S. Mail and email)
> 565 Congress Avenue
> Havre de Grace, Maryland 21078
> threecando@gmail.com

DATED at Scottsdale, Arizona this 21st day of May, 2018.

> s/William J. Golz
> *William J. Golz, Ph.D.*
> Defendant, pro se

ATTN  Civil Action No. 17-cv-1152-RBJ-MEH

DATE  May 21, 2018

To  Clerk's Office
Alfred A. Arraj United States Courthouse
Room A-105
901 19th Street
Denver, Colorado 80294-3589
Phone:    (303) 844-3433

VIA  U.S. Priority Mail Express

FROM  William J. Golz, Ph.D.
Defendant, pro se
29714 N. 152nd Way
Scottsdale, AZ 85262-6942
Phone/Fax: (480) 816-5019
Email: wgolz@alumni.lsu.edu

Re  *Benjamin S Carson, Secretary of Housing and Urban Development v. Estate of Verna Mae Golz, et al.,* No 17-cv-1152 (D Colo).

This will transmit the pleading:

**Reply in Support of Defendant's Motion to Dismiss the Estate as a Defendant**

As practicable, please: (i) scan the enclosed pleading at high resolution so that the exhibit is readable, and (ii) upload this pleading to the CM/ECF system on the day that you receive it such that filing and service will be effectuated on the same date.

Thank you.