```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF COLORADO
 2

 3   BENJAMIN S. CARSON,          .   Case No. 17-cv-01152-RBJ-MEH
     Secretary of Housing and     .
 4   Urban Development,           .
                                  .
 5            Plaintiff,          .
                                  .
 6   vs.                          .   Alfred A. Arraj Courthouse
                                  .   901 19th Street
 7   ESTATE OF VERNA MAE GOLZ,    .   Denver, CO  80294
     WILLIAM J. GOLZ, and         .
 8   MARCUS J. GOLZ, and Unknown  .
     Heirs and Claimants of the   .
 9   Estate of Verna Mae Golz,    .
                                  .
10            Defendants.         .
                                  .   April 16, 2018
11   . . . . . . . . . . . . . .  .   10:02 a.m.

12
        TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
13        MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE

14
     APPEARANCES:
15

     For the Plaintiff:          U.S. Attorney's Office-Denver
16                               By:  Jasand Patric Mock
                                 1801 California Street
17                               Suite 1600
                                 Denver, CO  80202
18                               (303) 454-0100

19   For the Defendant:          William J. Golz, pro se
     By phone                    29714 North 152nd Way
20                               Scottsdale, AZ  85262
                                 (480) 514-2108
21

     Court Recorder:             Clerk's Office
22                               U.S. District Court
                                 901 19th Street
23                               Denver, CO  80294

24

25
```

1   Appearances continued:

2   Transcription Service:        AB Court Reporting & Video
                                  216 16th Street
3                                 Suite 600
                                  Denver, CO  80202
4                                 (303) 296-0017

5   Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Time Noted:  10:02 a.m.)

2              THE COURT:  Good morning.  Please be seated.

3              Case number 17-cv-01152, Benjamin S. Carson versus

4    Estate of Verna Mae Golz, et al.

5              For the Plaintiff, please?

6              MR. MOCK:  Assistant United States Attorney Jasand

7    Mock, on behalf of Benjamin Carson, Secretary of Housing and

8    Urban Development.

9              THE COURT:  Okay.

10             MR. MOCK:  With me this morning, Your Honor, is

11   Jesse Loper.  Mr. Loper is a HUD trial attorney at the Office

12   of Counsel for Region 8.

13             THE COURT:  All right.  Is he special, as well?

14             MR. MOCK:  No, Your Honor, nor is he appearing.

15   He's just here for status.

16             THE COURT:  Okay, thank you.  Good morning.

17             On the phone, please?

18             MR. GOLZ:  William Golz.

19             THE COURT:  Thank you.  All right, so we have to

20   decide what we're going to do in this case.

21             MR. GOLZ:  Your Honor?

22             THE COURT:  Yes, go ahead.

23             MR. GOLZ:  As an initial matter, might I ask if

24   you and Mr. Mock received the email I sent you at about 3:00

25   a.m. this morning your time, with the attached memo?

1          THE COURT:  I did, yes, thank you.

2          MR. GOLZ:  Okay.  Will that be entered into the

3    record in these proceedings, or do I need to submit that with

4    -- as an exhibit with a motion?

5          THE COURT:  Well, it's not going to be considered

6    a motion, the way you've done it, so it's not in the record.

7    It was just an email.  Okay?

8          MR. GOLZ:  All right.  Okay.  So I need to submit

9    it if I want it to be part of the record?

10          THE COURT:  Yes.

11          MR. GOLZ:  Okay, thank you.

12          THE COURT:  Okay.  Let me hear from you, Mr. Mock,

13    first on what we need to do at this point.

14          MR. MOCK:  Your Honor, this is a foreclosure

15    action.

16          When Ms. Golz passed away in 2014, she codified

17    about a quarter of a million dollars of withdrawals that she

18    had made on her very first mortgage.

19          We have filed the action.  Doctor Golz has filed

20    an answer with affirmative defenses.

21          THE COURT:  Remind me how much is at issue in the

22    case, please?

23          MR. MOCK:  Presently, Your Honor, it is about --

24          THE COURT:  Without penalty.  Just principal.

25          MR. MOCK:  Just principal?

1          THE COURT:  Yes.

2          MR. MOCK:  Principal plus interest, Your Honor?

3          THE COURT:  Just start with principal, please.

4          MR. MOCK:  Principal withdrawn was approximately

5   $170,000.00, Your Honor.

6          THE COURT:  And that should have been designated

7   as income, but it wasn't?  Is that what you're saying?

8          MR. MOCK:  No, Your Honor.  The issue is that

9   neither principal nor the interest which accrued during the

10  loan has been repaid.

11         And so pursuant to the reverse mortgage, the

12  security for that loan, the principal plus the interest, is

13  the home in Nederland, Colorado.

14         THE COURT:  Right, but how much principal did Ms.

15  Golz not pay the United States Government that she should

16  have paid?

17         MR. MOCK:  She has not paid back any of the

18  principal, Your Honor.

19         THE COURT:  So this was money borrowed from HUD?

20         MR. MOCK:  It was money borrowed from a private

21  lender, and insured by HUD.

22         THE COURT:  Okay, so the ultimate risk lies with

23  the U.S.?

24         MR. MOCK:  Yes, Your Honor, and that risk has

25  actually been realized.  HUD paid the lender approximately

1  $241,000.00 in 2011.

2        THE COURT:  Okay, I understand.  So $170,000.00,

3  then plus principal and interest, and penalties?

4        MR. MOCK:  Service fees, as well, Your Honor.

5        THE COURT:  Service fees.  Okay, and what would be

6  the total claimed in --

7        MR. MOCK:  Total claimed at the time of the

8  amended complaint in August of 2017 was about $288,000.00.

9        THE COURT:  And how much is that increasing either

10 monthly or yearly, approximately?

11       MR. MOCK:  Your Honor, I don't know, but I could

12 find out.

13       THE COURT:  Okay.  What is the interest rate?

14       MR. GOLZ:  Your Honor?

15       THE COURT:  Yes, just a second.

16       MR. GOLZ:  Can I interject something here?

17       THE COURT:  Just a second, Mr. Golz.  What is the

18 interest rate that you're using?

19       MR. MOCK:  Your Honor, I don't know what the

20 interest percentage is, but I can find out and report.

21       THE COURT:  Okay.  All right, go ahead, Mr. Golz.

22       MR. GOLZ:  For the reasons stated in my memo, I

23 just want for the record to object to this meeting going

24 ahead.

25       THE COURT:  Well, your objection is overruled for

1 the purposes of today.

2          MR. GOLZ:  I just wanted that to be on the record.

3          THE COURT:  Understood.  And I'm not going to

4 recuse myself under any circumstances, because these are just

5 simply not conflicts.

6          But you can go ahead and file a motion.  Feel free

7 to do so.

8          MR. GOLZ:  I will, and I'd appreciate you waiting

9 for that to occur.

10          THE COURT:  All right.  By the way, Mr. Golz, your

11 lawyer was my boss here, and you didn't think that was a

12 conflict.

13          MR. GOLZ:  I had no awareness of that, or I may

14 have.  What lawyer was that, Your Honor?

15          THE COURT:  Edward Nottingham was my boss as a

16 judge.  He was the Chief Judge of the United States District

17 Court, and as such, he was my boss, and that was fine.

18          MR. GOLZ:  Okay.

19          THE COURT:  And that was far more recent than any

20 contact I've had more than 12 years ago.

21          MR. GOLZ:  Yes, but what we're here about is

22 decisions that you could make as to whether or not the

23 circumstances of this trespass were criminal, and the

24 potential consequences to Mr. Trascos and to Zachary

25 Mountain, and that's a very different situation, Your Honor.

1          And as another matter, you're calling me Mr. Golz.

2    I'm not really offended, but I do have an earned Ph.D., and I

3    have expressed a preference to be called Doctor Golz.  And I

4    would appreciate you extending me that courtesy.

5          THE COURT:  Okay.  Please proceed.

6          MR. MOCK:  Thank you, Your Honor.  Doctor Golz is

7    one of Ms. Golz's sons.  He is also the sole heir and the

8    personal representative of the Estate.

9          Doctor Golz lives in Arizona.  Although the Estate

10    has not paid back the debt, Doctor Golz continues to use the

11    property.

12          At this point, --

13          THE COURT:  Did you have a lien on the property?

14          MR. MOCK:  Pardon me, Your Honor?

15          THE COURT:  Do you have a lien on the property?

16          MR. MOCK:  Yes, Your Honor.  We have deeds of

17    trust to secure the property for purposes of recovering on

18    the loan.

19          THE COURT:  Okay.  Very good.

20          MR. MOCK:  And we have filed our foreclosure

21    action.  Most of the salient elements are admitted in the

22    scheduling order that was filed in October.  The notes are

23    authentic, they are valid, the debt has not been repaid.

24          THE COURT:  Why don't you move for summary

25    judgment, then, or for a motion on the merits brief?

1    MR. MOCK:  Your Honor, we had considered a motion

2  for summary judgment.  Interposed between that was an amended

3  answer, which included counter-claims, and a further amended

4  answer that dropped those counter-claims, but continues to

5  assert affirmative defenses.

6    Now, we believe those affirmative defenses are

7  ripe for a motion to strike.  That motion has been fully

8  briefed and submitted.

9    THE COURT:  Right.

10    MR. MOCK:  And we continue to believe that it

11  would help resolve the major sticking point on the scheduling

12  order, which is the scope of discovery.

13    Doctor Golz's affirmative defenses are legally

14  insufficient, but would take us far afield of the actual

15  issues in this case and lead not only to broad, burdensome,

16  and expensive discovery, but also to a multiplication of

17  proceedings.  It is simply unnecessary.

18    THE COURT:  Understood.  So, it sounds like what

19  you're proposing, then, is nothing happens until that motion

20  is decided, which may be in the next week, by the way.

21    So is that what you're proposing?

22    MR. MOCK:  Yes, Your Honor, we do believe that

23  would be most efficient.

24    THE COURT:  All right.  And if -- let's

25  hypothesize that the motion is denied, then you think the

1   discovery -- well, since Judge Jackson has the case, this is

2   going to be a recommendation by me.  But I'm going to proceed

3   forward on the basis of my recommendation on what we do in

4   this case, because a recommendation can take six months to

5   eight months or more to get decided.

6           And we can't afford to just let the case sit

7   around that long.

8           So there will be a recommendation out within

9   probably a week or two.

10          So let's say that the motion was denied, then you

11  think discovery is necessary, and the scope of discovery

12  would be governed by the affirmative defenses?

13          MR. MOCK:  Your Honor, I do think that if the

14  motion were denied, the scope of discovery should be tailored

15  to whichever affirmative defenses survive.

16          THE COURT:  Okay.

17          MR. MOCK:  As well as a couple of items that would

18  be part of our case in chief.  In principle, whether or not

19  Ms. Golz is, in fact, living at the property --

20          THE COURT:  Doctor Golz.

21          MR. MOCK:  No, Doctor Golz's mother, Your Honor.

22          THE COURT:  Oh.

23          MR. MOCK:  Ms. Verna Mae Golz is the decedent.

24          THE COURT:  So is there another Golz involved?

25          MR. MOCK:  There are several other Golz's

1 | involved.

2 | THE COURT:  All right.  Living at the residence?

3 | MR. MOCK:  No, Your Honor.  As far as I -- well,

4 | Doctor Golz can probably speak to that.

5 | THE COURT:  Who is Mr. Golz you just referred to?

6 | MR. MOCK:  Let me back up and set the --

7 | MR. GOLZ:  Wait, I haven't had -- I've said

8 | probably 10 words during this whole meeting, and I'd like to

9 | really have an opportunity here.

10 | THE COURT:  You can, Doctor Golz.  We do this one

11 | at a time, so I'm getting the United States' position and

12 | then I'll let you speak as long as you want.  Okay?

13 | MR. GOLZ:  Fine.

14 | THE COURT:  Go ahead.

15 | MR. MOCK:  Judge Hegarty, let me step back to the

16 | origination of this loan.  In 2002, Ms. Verna Mae Golz,

17 | Doctor Golz's mother, took out a loan with Financial Freedom,

18 | the private lender.

19 | THE COURT:  Uh-huh.

20 | MR. MOCK:  That loan was insured by HUD.  In 2011,

21 | Ms. Golz had taken withdrawals and interest had accrued to

22 | such a point that First Freedom was able to collect on that

23 | insurance from HUD, and HUD paid cash to First Freedom.

24 | THE COURT:  In 2011?

25 | MR. MOCK:  In 2011.

1            THE COURT:  Okay.

2            MR. MOCK:  Ms. Golz passed away in 2014, in May of

3    2014.  And her death was an event of default under the terms

4    of these reverse mortgages.

5            THE COURT:  Okay.

6            MR. MOCK:  Basically the way it works is:  She was

7    able to borrow the money, get access to it during her

8    lifetime, she didn't have to pay it back as long as she was

9    alive and resided at the property.

10           And that property was 130 Beaver Creek in

11   Nederland, Colorado.

12           THE COURT:  Okay.

13           MR. MOCK:  Doctor Golz is one of Ms. Golz's three

14   sons.  The other two sons are Marcus Golz and Matthew Golz.

15           THE COURT:  And they defaulted?

16           MR. MOCK:  They have defaulted.  I contacted both

17   of them by email last week concerning this hearing, and I

18   have not received a response.

19           I also asked if they would enter a disclaimer's

20   interest, but I have not received a response to that, either.

21           THE COURT:  Understood.  Is that just kind of a

22   belt and suspenders, since you do have a default already?

23           MR. MOCK:  We have an entry of default, Your

24   Honor.  We do not yet have a judgment of default.

25           THE COURT:  Oh, okay.

1          MR. MOCK:  Now that Judge Jackson is involved,

2   perhaps we will pursue getting that judgment.

3          THE COURT:  All right.

4          MR. MOCK:  I want to give them one last chance to

5   disclaim an interest.

6          THE COURT:  Okay.

7          MR. MOCK:  When Ms. Golz passed away in 2014, the

8   loan became fully due and payable to HUD.

9          THE COURT:  Right.

10          MR. MOCK:  There were efforts made to work things

11   out with Doctor Golz.

12          THE COURT:  Three years of efforts, I guess.

13          MR. MOCK:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. MOCK:  But so far, nothing has been repaid.

16   And all the while, HUD is without its money.

17          Doctor Golz still has use of the property.

18          THE COURT:  Okay.  Okay, Doctor Golz, go ahead if

19   you want to respond.

20          MR. GOLZ:  Yeah.  This is only partially true.

21          In the first place, when my mother borrowed the

22   money as, you know, from the pleadings, the lender, Financial

23   Freedom, defrauded her of $103,000.00 worth of separate

24   property.

25          When her well ran dry with the -- it was a 800

1    year record draught in 2004.  There's a seven foot well at

2    the property, and it went dry.  She tried to borrow against

3    her lot from the USDA, and they discovered that her property

4    had been -- separate property had been illegally liened and

5    was therefore unavailable as collateral.

6            So my mother, during that same year, and this is

7    all a matter of public record, a septic truck came to pump

8    out her septic tank and ran over the tank.

9            And since my mother was unable to borrow money to

10   have those basic necessities fixed, that has remained as it

11   is.

12           She made repeated efforts to try to have HUD

13   release that property, and HUD refused.

14           And so my mother lived from 2004 until 2014, for

15   10 years, without a source of potable water in her house, and

16   without a fully functioning septic, and with certain

17   electrical wiring which was found to be unsafe.

18           And part of that was due to HUD's original

19   appraiser, who was negligent.  Did an appraisal in the

20   winter, in November 2001, when there was snow on the ground,

21   which we see in the appraisal photographs, and so he wasn't

22   able to observe these defects that did not comply with HUD's

23   regulations.

24           And in -- there is also -- the house was built in

25   1963.  There is a front porch that sits that needs to be

1 removed from the building.  It sits only on a lodge pole, and

2 that's finally given way.

3          There was foxed that had dug underneath it and

4 were living under there.

5          And so the house, as it sits right now, and I

6 think the Government had made assertions that we're enjoying

7 the house, I think is their verbiage, as a second home, and

8 nothing could be farther from the truth.

9          The house does not meet Colorado's minimum

10 standards of habitability right now.  And the time that we --

11 me and my family have spent in the house has been there to

12 maintain it and to keep HUD from coming back and committing

13 another criminal trespass at our property.

14          And these things are not -- the criminal trespass

15 itself and all of these other things are not irrelevant to

16 these proceedings.

17          And as far as the assertion that we owe or that my

18 mother owes $280,000.00, I think just as a matter of equity,

19 you begin to look at the amount that my mother suffered as a

20 consequence of the financial benefit that HUD and their

21 lender enjoyed by keeping $103,000.00 worth of her property.

22 That was just the value in 2002.

23          When they returned it to her after they required

24 her to file suit in 2011, that was the year for Colorado real

25 estate property values, and its value at that time was

1   approximately $14,000.00.

2            And so there's a difference there of $89,000.00

3   that my mother lost and that she can never recover.

4            And because of that, she had to live for 10 years

5   with no potable water, no sewage, and unsafe electrical.

6            And when my mother died on May 16th, when she was

7   down here visiting us, I sent HUD a letter on May 23rd, a

8   certified letter to Duval, their servicer at that time,

9   citing to their regulations and asking them to have an

10  appraiser come out and appraise the property.

11           And I received no reply.  I had a personal friend

12  of mine, who is an attorney here in Arizona, call HUD, or

13  call their servicer, rather, Duval, and they represented that

14  they hadn't received the certified letter, even though we had

15  the signed green receipt.

16           And this went on month after month after month.

17           In October, the Secretary, through Ivory Hines,

18  the Director of Single Family Asset Management, stated that

19  we could purchase the property for 95 percent of the

20  appraised value, and they would have an appraiser contact us.

21           That was October 10th.  So what is that, May,

22  June, July, August, five months after my mother died.

23           So November 10th came, still no appraiser.  So I

24  wrote and I told -- I reminded the Secretary that there was

25  sub-grade defects, below grade defects, that were very

1  significant and would affect the appraisal value.

2          And so no one called until January.  And so I

3  asked them to wait until the snow had abated, because we're

4  at 8,600 feet there, and the defects are on the north side of

5  the house adjacent to an Aspen wood.

6          And so they refused to do that.  And so we were

7  unable to get an appraisal.

8          And then in the summer of 2015, when the snow had

9  melted, I asked them to come and conduct an appraisal.  They

10  said no.  They made six foreclosure threats.  And this was

11  done by Millicent Potts, the program counsel for the Office

12  of Insured Housing, under her direction, six foreclosure

13  threats in 2015.  Didn't foreclose.

14          In 2016, I wrote to the Secretary again on May

15  4th.  Well, in reply to that, on May 11th, June 6th, and July

16  6th, HUD sent one of their agents to trespass on my property

17  when my family was home, and leave door hangers.

18          I wrote letters to them and I told them to cease

19  and desist.

20          And on August 2nd, I wrote the letter, which is

21  exhibit G in my response to the Government's motion to

22  strike, and that was a letter to Mr. Trascos, your colleague,

23  and I sent him a copy of the Colorado Criminal Trespass

24  Statute, and it was a copy of a letter I sent, stating that

25  HUD was to cease and desist trespassing on my property.

1          And so on October 9th, I wrote another letter of
2   that type to Shiwon Choe, who is no longer with the U.S.
3   Attorney's Office, as you know, and to Elizabeth Forehlke,
4   his co-counsel at that time, who also is no longer with the
5   U.S. Attorney's Office, stating that HUD was not to trespass
6   upon the property and that I had a security alarm installed.

7          On December 2, 2016, we had -- this was one week
8   before my wife was to go get a biopsy on a suspicious lesion
9   on her nose, and she received a call from ADP, the security
10  services, saying there was a break-in at the house.

11         And so I immediately got in my vehicle and I drove
12  to Colorado.  And when I got there, the storm door was
13  flapping in the breeze.  HUD had sent their agents out.  The
14  storm door is a very solid type, and they had twisted the
15  handle off and broken it, ruined the storm door.

16         And from what I understand from my neighbor, they
17  took a sledge hammer and knocked the front door handle off,
18  and then went in to put what they called -- what they told
19  the responding officer was a "HUD lock."

20         And so they were inside of my dwelling, and there
21  was damage to other things.  It looks like they tried to come
22  in through the back window at first, and knocked over a desk
23  with a laptop computer on it.  And there was a couple of
24  pieces of depression glass that my mother had given to my
25  wife, that were missing.

1          And so because of that, my -- because I had to go

2   up there, then HUD advised me that they had -- that they had

3   -- were not going to respect my wishes, in other words.

4          So I had my son, who was going to college down

5   here, and had a full scholarship to Fair Lakes Community

6   College, he had to give up that scholarship and move to

7   Colorado.  And he stayed at the house throughout 2017 so that

8   HUD would not come back in.

9          Last Christmas, I wrote -- I emailed Mr. Mock and

10  Mr. Mountain and asked them to assure me that HUD would not

11  again break in, because my wife wanted my son to come home

12  for Christmas.  Mr. Mock emailed me back, HUD has a

13  contractual right to break into your property.

14         And so, you know, this whole situation, from the

15  time this loan was made, and the things that the -- the grief

16  and hardship that HUD has visited upon my family as a result

17  of this, no one should have to go through that.

18         And the -- and so I really disagree that, first of

19  all, that my mother owes the $280,000.00.  Because as a

20  matter of equity and as a matter of HUD's guidance, and as a

21  matter of their not just wanton neglect, but their actual,

22  you know, abuse of the process, to simply shut us out and

23  stonewall us and say "we're not going to give you an

24  appraisal," and then when you object or you make requests of

25  the U.S. Attorney's Office to investigate a criminal trespass

1   at your property, then we're going to file a foreclosure

2   against you and further misuse Government resources to

3   torment and abuse your family.

4           So these things are all relevant, Your Honor.

5           The fact that they're -- the house is not worth

6   $280,000.00, because HUD defrauded my mother of her property

7   and wrote it from $103,000.00 down to $89,000.00, keeping her

8   from getting a well and a septic and a decent living

9   environment.

10          And so we've been refused the right to pay off the

11  property and to recover, you know, some of that damage they

12  caused us.

13          And so now, you know, the Government comes into

14  this Court and says "look, all that stuff is irrelevant.

15  Mrs. Golz got the value of what she received during her life

16  for $300,000.00."  And that's absolutely patently false.

17          What my mother got as a result of making the

18  mistake of entering into a mortgage with Housing and Urban

19  Development is she got the last 10 years of her life ruined.

20          THE COURT:  Okay, thank you.  All right.  So what

21  I propose is that we get a scheduling order in good shape,

22  and then depending on which way we go on the recommendation

23  of the motion to strike, I'll enter that scheduling order and

24  it will be reflective of the status of the case at that time.

25          But it's your position that if the motion is

1  granted in its entirety, that there should be no discovery

2  then?

3          MR. MOCK:  Your Honor, if the motion is granted in

4  its entirety, I think this matter is ripe for a motion for

5  judgment on the pleadings or a motion for summary judgment.

6          THE COURT:  Right, but that doesn't answer my

7  question.  It might be ripe for those things, but that's not

8  dispositive as to whether discovery is allowed to occur in a

9  case like this.

10         So what is your position on that issue?

11         MR. MOCK:  Your Honor, I think if the motion to

12 strike is granted in its entirety, there is no need for

13 discovery in this matter.

14         THE COURT:  As a practical matter, but not a --

15 there's no legal bar to discovery.  You're not claiming this

16 is the kind of case, ERISA, or other kind of case, where

17 discovery is not permitted?

18         MR. MOCK:  No, Your Honor, that's correct.

19         THE COURT:  Okay.

20         MR. MOCK:  This is not the sort of case where

21 discovery is not permitted, though I do think if the

22 surviving matters concern the administrative procedure here,

23 that discovery should be tailored in accordance with the APA.

24         THE COURT:  Understood.  So you understand that in

25 order for you to not have discovery, and I think Doctor Golz

1  probably wants discovery, he would have to file a motion to

2  stay along with any dispositive motion that you file, because

3  that's the only mechanism that we have, given that it's not

4  my case.

5          You know, I can't just informally stay something

6  that belongs to Judge Jackson.

7          MR. MOCK:  Your Honor, at this time the parties

8  presently have a stay.  They agreed to it in the October

9  scheduling order, in fact.  It's not really so much a stay as

10 an agreement to forego discovery.

11         Now, one wrinkle on that is that at the time that

12 agreement was entered and signed by the parties, Defendants

13 had APA counter-claims pending.  And so we were proceeding to

14 prepare with a view towards producing an APA record.

15         Those counter-claims were dropped before the

16 record was due to be produced.

17         So, Your Honor, I don't think we're so much asking

18 for stay as it is that the parties already have an agreement.

19 But under the string cheese incident standard, if this were

20 evaluated as a request for a stay, I think we would satisfy

21 that.

22         And we could certainly brief that for Your Honor,

23 or I'm happy to address is now, if you'd like to hear on

24 those points.

25         THE COURT:  Well, so there's two points about what

1   you think is the status of the case, where you said that the

2   parties agreed to something.

3            Number one, of course, Doctor Golz could withdraw

4   that agreement at any time, right?  It's not a contract, it's

5   just a stipulation.  And if he wants to withdraw his

6   stipulation, he could.  Number one.

7            Number two, I think we -- I think that the -- is

8   that still the present pending scheduling order?

9            MR. MOCK:  Your Honor, in December you vacated the

10  deadlines and conferences set in the October order.  But

11  otherwise, I thought that order remained in effect.

12           THE COURT:  Okay, let me take a look.

13      (Pause)

14           THE COURT:  Yes, it just says vacates the

15  deadlines and conference dates set in the current scheduling

16  order.

17           And then -- I mean, but we asked you to submit a

18  revised one.

19           So, I guess, Doctor Golz, to the extent that the

20  Government is relying on your agreement to informally stay

21  the case, is that still your agreement?

22           MR. GOLZ:  I'm not sure I understand, Your Honor.

23  They're relying on what?

24           THE COURT:  Okay, well, at one point, you and the

25  Government agreed that you'll wait for some of these

1   preliminary matters to iron themselves out, such as your

2   getting counsel, the case being in a posture ready to go

3   forward, that was a little bit premature.  So apparently you

4   agreed with the Government to not engage in discovery.

5          Now, is that still your desire at the moment to

6   not engage in discovery?

7          MR. GOLZ:  No, I don't -- I believe that the -- as

8   you call it, the stipulation to not engage in discovery is

9   based upon the -- having an APA claim and having the

10   administrative record generated, correct?

11          THE COURT:  I don't know.  Is that -- was that

12   your understanding, Mr. Mock?

13          MR. MOCK:  Your Honor, that was part of the

14   agreement.

15          THE COURT:  Okay.

16          MR. MOCK:  It was that the parties would forego

17   discovery with the right to apply to reopen discovery after

18   production of the APA record, but the APA record was

19   conditioned on the APA claim.

20          THE COURT:  I understand.  Well, so to avoid any

21   further confusion, we're back at Ground Zero.

22          MR. GOLZ:  Well, can I respond to that and maybe

23   it will resolve a little bit of this question here.

24          THE COURT:  Okay.

25          MR. GOLZ:  In that the -- I think it is important

1   that we have your finding and recommendation on the

2   Government's motion to strike and my response.

3             THE COURT:  Okay, so you do want to wait for that,

4   Doctor Golz, is that correct?

5             MR. GOLZ:  Yes, before we decide on what discovery

6   we're going to need, especially since that's going to be --

7   you're going to make that finding and recommendation in the

8   immediate future, correct?

9             THE COURT:  Right.  So is it your position, then,

10  if your affirmative defense, at least some of them, are

11  allowed to go forward, you want discovery?

12            MR. GOLZ:  Yes, document discovery.  That's all

13  I'm going to required.

14            THE COURT:  Just document discovery.  Okay.  And

15  if it's granted, and your affirmative defenses are stricken,

16  then what is your position as far as discovery?

17            MR. GOLZ:  I don't know.  I'd like to see the

18  ruling -- I'd like to see your finding and recommendation

19  before I make a decision.

20            THE COURT:  Okay.

21            MR. GOLZ:  The other thing is this, and I think I

22  have one more thing I want to add and make clear as to what

23  my position is.

24            This is not just a foreclosure issue.  There's a

25  very significant public policy issue here.  And that is

1    whether or not the Government has a contractual right to

2    break into a property that they've been notified, in fact

3    received constructive notice in repeated letters sent by

4    certified mail, they claim that they can come in to violate

5    HUD policy, violate the Colorado Forcible Entry and Detainer

6    Statute, which requires a foreclosure to be completed, and

7    the occupants to be evicted by the Sheriff's Department, or

8    whoever is responsible.

9           In my mother's property, it would be the Sheriff's

10   Department.  Instead, they bypassed all of that and come with

11   a sledge hammer and knock the front door off and come into

12   your property.

13          So that's really whether or not -- and the

14   Government has asserted that their contract with my mother,

15   which was not a contract with my family, either, and in fact

16   we have the status of tenants.  We are the legal tenants of

17   that property, legal tenants in the stay.

18          I think that's a clear misrepresentation of firmly

19   established law, because there is no contract of any kind

20   that allows you to violate a statute, particularly a criminal

21   statute, and in this case it was a felony first degree

22   trespass.

23          And the fact that HUD knew it was wrong is very

24   obvious by the exhibits A through D in ECF 64, my amended

25   answer, where they stayed it on the work order that it was a

 1  HUD acquisition, and where the responding officer from the

 2  Nederland Police Department called and spoke with Zack, a BLM

 3  supervisor, whole him that HUD had acquired the property,

 4  that BLM had purchased that property from HUD, and that they

 5  were -- now they are to protect their property.

 6          And so that over and above the other issue of the

 7  foreclosure, this is not just a normal foreclosure, Your

 8  Honor.  We have the very credible supporting evidence,

 9  including a very long police report, where the police

10  sergeant tried to contact HUD and BLM managers.  They refused

11  to call him back.

12          And one of those BLM managers, Tracy Willingham,

13  her records request by her fulfilled by the Sheriff's

14  Department, is the Government's exhibit 7 in their motion to

15  strike.

16          So there's a clear connection, you know, HUD

17  ordered this break in.  And Mr. Trascos and Shiwon Choe and

18  Elizabeth Froehlke and the Secretary of HUD, had all been

19  notified that my family was occupying the property.

20          So there is -- one of the issues here is:  Is the

21  Government allowed to go around with a sledge hammer to break

22  into people's houses because they have a -- because they

23  assert that there may have been -- that the mortgage may be

24  in default, and one of those default events is failure to pay

25  taxes.  "Oh, sorry, we didn't get the notice from the

1   treasurer that you paid your taxes.  We didn't really mean to

2   ruin your $800.00 storm door, beat your front door handle

3   off."

4          And so, you know, that takes us out of the realm

5   of a normal foreclosure action.

6          THE COURT:  Right, but Doctor Golz, some of those

7   things you mentioned, while they may be appropriately in a

8   lawsuit, it may not be in this lawsuit.

9          So the United States is like any other private

10  person in the State of Colorado.  If they engage in acts that

11  constitute a violation of someone's rights, they can be sued

12  for that.  That's a separate matter than what we're doing

13  here, and it's not a defense to what they're claiming.

14          It may be a basis for damages for you under a law

15  called the Federal Tort Claims Act, which allows you to sue

16  the United States Government for money damages if it violates

17  your rights.

18          And I promise you that a government official

19  trespassing and damaging your property, if it's not in

20  accordance with the law, would be a tort that you could sue

21  for.

22          So you have two years from the date that happens

23  until you can file an administrative claim.  Just look up the

24  Federal Tort Claims Act.  You'll have to do an administrative

25  exhaustion on that and let the Agency try and settle it first

1  before you file a lawsuit in United States District Court.

2            But there are remedies for that, it just may not

3  be in this lawsuit.  Okay?

4            MR. GOLZ:  Yeah, I'm aware of that.  So you're

5  telling me at this point that my -- that the unclean hands

6  defense, based upon a criminal trespass, is not going to

7  survive?

8            THE COURT:  No, I'm not telling you that at all.

9  I'm saying that some of the things you're talking about are

10  common law torts, and you can sue the United States for

11  damages.

12            And, yes, that may be possibly something you could

13  raise as unclean hands.  I don't know.  I'm not saying that

14  you can't, I'm just --

15            MR. GOLZ:  Well, it is in my answer and in --

16            THE COURT:  Okay.  All right.  So what I propose

17  to do is this:

18            I have both of your competing scheduling orders.

19  I will get the decision out -- the recommendation out on the

20  motion to strike, and then I will enter a scheduling order.

21  Okay.  And that will be reflective of what I think the scope

22  of discovery should be.

23            MR. GOLZ:  All right.  I'd like to raise a couple

24  of final issues, if I may.

25            THE COURT:  Okay, just a second.  Let me finish my

1   part here.

2           Then I want the United States to submit a brief on

3   whether the Estate is in default, because it is unrepresented

4   by counsel.  Will you please let me know your position?

5           And then, Mr. Golz, as soon as that's filed, you

6   can file a response brief on whether your mother's estate is

7   in default, because as a general proposition in Federal

8   Court, only natural persons can represent themselves.

9           There may be some limited ability here to

10  represent an estate.  I think as we've done some research,

11  most courts do not permit that.  Some courts don't address

12  it, although there are cases where there's an estate that's

13  unrepresented, but it's simply not addressed, and so the

14  court is silent.  Apparently in those cases, no one raised

15  the prospect that an estate cannot be represented by a pro se

16  litigant.

17          So would you please do that?  How much time do you

18  think you'll need for that?

19          MR. MOCK:  Your Honor, I would think a week.

20  We've looked into that a bit ourselves, and it is an

21  interesting line of case law on that.

22          THE COURT:  Okay, very good.

23          MR. GOLZ:  So what, are you saying that you're

24  going to enter a default for the Estate not being --

25  appearing at this status conference?

1        THE COURT:  No.  What I'm saying is at all times a

2   Federal Judge has to look at the jurisdiction that they have

3   and the position of the parties.

4        And Federal Law says that an estate cannot be

5   represented by a pro se litigant, that it must be represented

6   by an attorney.

7        For example, --

8        MR. GOLZ:  I understand.

9        THE COURT:  -- Doctor Golz, a corporation cannot

10  appear in Federal Court by the CEO.  A corporation would have

11  to have a lawyer.  If they don't have a lawyer, they would be

12  in default.  A default would be entered against them after a

13  reasonable time of allowing them to try and get a lawyer.

14       But if they didn't, then a default would be

15  entered against them and a default judgment, because I didn't

16  make the rules up, they just simply do not allow non-natural

17  persons to be represented pro se.

18       So an attorney has to come in and do that.  So I

19  just wanted to know the position of the United States, and

20  then after they file their position, Doctor Golz, you can

21  feel free to file something, as well.  Okay?

22       MR. GOLZ:  Well, I have a question, then.  What I

23  would like, if this is within the realm of possibility, I'm

24  not an attorney, but if the Government could also address

25  whether or not they would object to my -- I'm the sole

1  devisee of the Estate.  My brothers have no interest in the

2  property.

3        If I would have issued a PR deed to the property

4  from the Estate to myself, that would then eliminate my

5  brothers and it would eliminate the Estate, and I would be

6  the sole remaining Defendant, and it would simplify matters.

7        THE COURT:  So you would do potentially a quit-

8  claim deed, you would take all interest in the property, and

9  then you -- as part of that, you would agree to assume any

10  liability that's associated with the property and with your

11  mother's Estate?

12        MR. GOLZ:  I don't know.  That would be -- I guess

13  I would have to find out if that would be the position it

14  would put me in.

15        THE COURT:  Okay.  Why don't you discuss that with

16  the United States.  I don't think you would necessarily have

17  a disagreement with that, because I doubt there's anything in

18  the Estate itself.  You just want the property plus the

19  penalties, right?

20        MR. GOLZ:  The Estate is not -- there's nothing.

21  No assets in the Estate but the property.

22        THE COURT:  Right.  So, to me, this sounds like a

23  good way to go, Doctor Golz.  But I don't think the United

24  States is properly prepared to take a position at the moment.

25        MR. MOCK:  Yes, Your Honor.  We are not taking a

1  position at the moment, but we would welcome anything that

2  would simplify the proceedings.

3          THE COURT:  All right.  Would you look into that,

4  as well?

5          MR. MOCK:  Yes, Your Honor.

6          THE COURT:  So, there are two, then.  First of

7  all, if you look into that part and you can get an agreement

8  that satisfies you out of Doctor Golz, and satisfies him,

9  then there's no need to brief that issue.

10         So why don't you put your efforts in that first.

11  But I want you to do this on a fast track, because the case

12  is now over a year old, I suspect.

13         So let me know -- you can let me know informally

14  through an email, just like Doctor Golz did.  Copy it to

15  Doctor Golz, what the results of that endeavor are, right,

16  and if, in fact, you can't work that out, then go ahead and

17  within a reasonable time after that file a position on

18  whether the Estate can forward with Doctor Golz representing

19  the Estate.  Okay?

20         MR. MOCK:  Yes, Your Honor.

21         THE COURT:  All right.  Let me make sure the

22  United States has no other issues for now.

23         MR. MOCK:  Your Honor, just two items very

24  quickly.

25         If Your Honor is going to be preparing a

1  scheduling order, the first is -- concerns the Plaintiff's

2  statement of claims and the undisputed facts.

3          Doctor Golz made substantive changes to both of

4  those sections in his draft proposal.

5          THE COURT:  Well, I will not let him make changes

6  to your statement of facts.

7          MR. MOCK:  Thank you.

8          THE COURT:  He can agree on whatever he wants to

9  agree on as far as undisputed facts, so I always let each

10 party say whatever they want to, unless it's profane, within

11 their statement of facts.

12         So yours will stay intact.

13         MR. MOCK:  Thank you, Your Honor.

14         THE COURT:  And then I'll meld the undisputed

15 facts to make sure they're truly undisputed.

16         MR. MOCK:  And I think, Your Honor, there were

17 some undisputed facts in the October 13 order, and I would,

18 of course, not dispute those stipulated facts.

19         The second item, Your Honor, concerns the

20 deposition of Doctor Golz.  Pursuant to the form instructions

21 for scheduling orders, I informed Doctor Golz that if

22 discovery is allowed, I anticipate taking his deposition.

23         THE COURT:  Sure.

24         MR. MOCK:  I think there are several significant

25 areas for that, Ms. Golz's place of residence being foremost

1    among them.  She signed her will saying she was a domicile of

2    Arizona in 2010.

3             Lot 2, which Doctor Golz referred to earlier,

4    stated as a $100,000.00 lot, was -- well, it was conveyed to

5    Doctor Golz in 2011.

6             THE COURT:  Was it contiguous to this property?

7             MR. MOCK:  I'm not sure whether it was or not,

8    Your Honor.

9             THE COURT:  All right.

10            MR. GOLZ:  Yes.

11            THE COURT:  Okay.

12            MR. MOCK:  It was conveyed to Doctor Golz in 2011.

13   Ms. Golz signed that in Maricopa County, Arizona.

14            By the way, her claims concerning First Financial

15   were dismissed, with prejudice, in Boulder County Court.

16   We've offered a citation to that decision in our reply.

17            THE COURT:  Well, whatever was within the scope of

18   those, then, would be binding.

19            MR. MOCK:  Yes, Your Honor.

20            THE COURT:  Okay.

21            MR. MOCK:  Ms. Golz's death certificate is in

22   Maricopa County.  And Doctor Golz signed probate forms in

23   2014 saying she was domiciled in Arizona.

24            THE COURT:  So where are you going with this,

25   though?

 1              MR. MOCK:   I think Doctor Golz -- sorry, Your

 2   Honor.   I think Mrs. Golz had moved to Arizona by perhaps as

 3   early as 2009, which is a breach of the notes.   It would be

 4   an event of default.

 5              And it matters in this case, Your Honor, because

 6   Doctor Golz's argument is that death is a special

 7   circumstance giving him -- in his view, the right to buy out

 8   this loan at less than its full value.

 9              If Ms. Golz had moved to Arizona, as these

10   documents suggest that she had, years before, then we

11   shouldn't be talking about any of this affirmative defense as

12   to whether or not HUD --

13              THE COURT:   Well, did you put that in your motion?

14              MR. MOCK:   Your Honor, it's in our complaint at

15   paragraph 50.   And it has not been in our motion to strike,

16   but if we go forward I would anticipate taking discovery on

17   that.

18              THE COURT:   Well, why -- if you already knew that,

19   and you think it is relevant to the issue of their

20   affirmative defenses, why didn't you put it in the motion to

21   strike?

22              MR. MOCK:   Your Honor, it's relevant to the

23   affirmative defenses if any of the affirmative defenses

24   survive.   It is a disputed issue of fact, however, and the

25   affirmative defenses are legally insufficient.

1        And so we have argued on the 12(f) motion, the

2   legal insufficiency, of the affirmative defense of APA

3   because Doctor Golz misinterpreted the law.

4        THE COURT:  Doctor Golz, where was your mother

5   living in 2010?

6        MR. GOLZ:  I have public records, Your Honor.  I'd

7   like to be able to submit those, because Mr. Mock has

8   asserted to me in an email -- let me point out the problems

9   with his request to take my deposition and why it's

10  absolutely unnecessary.

11       THE COURT:  No.  Before you answer any of that,

12  I'm asking you a question.  Where was your mother living in

13  2010?

14       MR. GOLZ:  Well, my mother would visit us, and she

15  would go to her home in Nederland, as she had always done.

16       Since the time her and my father separated in the

17  1970s, my mother would leave.  She went to Maine one time for

18  almost a year.  She went to stay with her sister in

19  California.  She would come and stay with me.  She would come

20  and stay with my brothers in Montana.  And she would go back

21  and forth between Colorado and visiting with us.

22       And I can -- to address the issue domiciliary is

23  the intent of the decedent, and there's a couple of issues

24  here.

25       One, I can definitively demonstrate by public

1   records that my mother's principal residence was her home at

2   130 Beaver Creek Drive in Colorado up until the time she

3   died.

4          THE COURT:  Well, how much time do you think on a

5   yearly basis, in terms of days, that she lived in Colorado in

6   Nederland?

7          MR. GOLZ:  I can't estimate that, Your Honor.  I

8   was not her custodian.  I think that's -- I can't tell you.

9          THE COURT:  Roughly.  Less than half or more than

10  half?

11         MR. GOLZ:  I don't know, Your Honor.  My mother

12  would visit me and she would come -- she would visit me, she

13  would go back to Colorado, she would visit her friends.

14         She was in -- I know this, that she was in her --

15  she was in her home at least for some period of every year.

16         THE COURT:  Well, who lives in Arizona?

17         MR. GOLZ:  That's what I feel I can say.  But I'm

18  not --

19         THE COURT:  Doctor Golz, hold on.  Hold on.  Who

20  lives in Arizona that she would visit?

21         MR. GOLZ:  Me.

22         THE COURT:  You?

23         MR. GOLZ:  I live in Arizona.  My brothers live in

24  Montana.

25         THE COURT:  Okay, so --

1          MR. GOLZ:  She would visit in Arizona, and it's --

2    she did sign documents when she was down here visiting me,

3    yes, she did.  But that doesn't mean she's a domiciliary.

4          And I've addressed Mr. Mock's question or issue in

5    my reply, that that was not opening probate here.

6          THE COURT:  Doctor Golz, whenever she was in

7    Arizona, was she living in your home?

8        (Pause)

9          MR. GOLZ:  What do you mean?

10          THE COURT:  Doctor Golz, you said you live in

11    Arizona.

12          MR. GOLZ:  Right.

13          THE COURT:  You said your mother visited in

14    Arizona.

15          MR. GOLZ:  Uh-huh.

16          THE COURT:  When she visited Arizona, I'm asking

17    you whether she physically lived, spent the night, in Arizona

18    in your home whenever she was in Arizona?

19          MR. GOLZ:  She did.  And so the -- but the

20    question here is -- there's another -- we're getting into a

21    whole other area here, which I don't see how it's even

22    relevant.

23          THE COURT:  Well, you were -- Doctor Golz, you

24    brought in breaking into the house.  I'm not sure that's

25    relevant.

1            But where she lives in the United States has

2    raised that completely relevant to the contract.

3            What we're dealing with here is contract issues,

4    and who owes what to whom.  That's the essence of this

5    lawsuit.

6            So what they've just told me, based on their

7    analysis of the law, that where your mother lived is relevant

8    to when a breach occurred.  And when a breach occurred is

9    relevant to any subsequent event.

10           So they're saying if a breach occurred as early as

11   2009 or 2010, that's when their rights would have accrued, or

12   at least their common party-in-interest, whatever the name of

13   that company was, Financial Freedom.

14           MR. GOLZ:  Your Honor, --

15           THE COURT:  So they're saying then thereafter

16   whatever happened is not relevant to the issues in the case,

17   because the property should have effectively -- the debt was

18   owed as early as seven or eight years ago.

19           That's all I'm saying.  That's what -- I don't

20   know if that's true, but that's what they're saying.  So each

21   of you has a right to say what you want.  I have to evaluate

22   what that means for my purposes.  I'm not going to be the

23   decider on the case.  Judge Jackson is.

24           I have to make sure that the case is properly

25   papered, or documented, in order for him to make an educated

1   decision about the law.

2          So that's all my role is in this case, is to

3   create a record for Judge Jackson to decide, and so that's

4   why I'm asking these questions.

5          But go ahead.

6          MR. GOLZ:  I'd like to just go ahead and submit --

7   you know, I would like to go ahead and submit the public

8   records I have from my mother.

9          And, you know, as far as -- to the extent of my

10  knowledge, she was always in her home in Colorado for some

11  portion of every year.  And that's what's required to meet

12  the requirements on her deed of trust, which says not be

13  absent from the property for more than 12 months.

14         THE COURT:  Okay.

15         MR. GOLZ:  And so to the extent of my knowledge,

16  she was never absent from the property for more than 12

17  months.  And I have public records up and through 2013, you

18  know, driver's license, pictures of her, dated with her

19  friends, in front of her house, and her eating out at a local

20  restaurant.

21         And so that really is going to put that to rest.

22  My mother did not -- she didn't default on her loan, she

23  didn't breach her contract.  All my mother did was, after --

24  you know, after living in 10 years of a sub-standard

25  environment, she died on May 16, 2014, when she was down here

1  visiting me.

2          THE COURT:  Okay.

3          MR. GOLZ:  And so there's -- it's just a fishing

4  expedition.

5          THE COURT:  Well, --

6          MR. GOLZ:  There's no reason that the Government

7  needs to depose me.

8          THE COURT:  Now, if the case does go into

9  discovery, --

10          MR. GOLZ:  Uh-huh.

11          THE COURT:  -- and the Government has a good faith

12  basis for their argument, then they're going to get discovery

13  into her bank records, her credit card records, her travel

14  records, if they believe that her legal residency resulted in

15  a violation of the terms of the agreement.

16          So I'm not saying whether that's going to occur or

17  not, but if there is an undisputed material fact as to where

18  she lived, that's the kind of discovery that you use to get

19  there.

20          MR. GOLZ:  Well, the other things is, yes, Your

21  Honor, I think that they're asking to make a breach of

22  contract claim, is that correct?  Do I understand that right?

23          MR. MOCK:  Your Honor, we are foreclosing under

24  the terms of the note.

25          THE COURT:  Well, the note is the contract.

1           MR. MOCK:  It is the contract, yes.

2           THE COURT:  So, yes, it is a breach of contract.

3           MR. GOLZ:  So the only -- other than just giving

4    them the right to foreclose, and what the Government is

5    claiming right now is that at the point that this is decided

6    by the Court, that the Government is entitled to all of the

7    money that's owed, principal and interest, up until that

8    date.

9           That would not change even if I did not have these

10   records to show that this was my mother's principal

11   residence, which I do, and that's a matter of her intent and

12   of her business.

13          And besides that, so if they're asking for a

14   breach of contract action, that's probate and that's

15   determined by State law.  And Colorado has a non-claim

16   statute, where any breach of contract action is forever

17   barred after -- from one year of the date of a decedent's

18   death.

19          So going back beyond May 16th, first of all, it

20   has nothing to do with me and I can't testify to that.  And I

21   can't -- because I was not my mother's custodian, and that

22   was her responsibility.

23          I can provide records to show that she was in

24   Colorado and that she did, you know, go in and do things like

25   with a personal check, and I may be able to find other things

1  as I look through her records.

2        But, I mean, as far as going back -- you know,

3  making claims before May 16th, I don't see how that has

4  anything to do with the Estate.  This is an action against

5  the Estate, not against my mother.

6        THE COURT:  Mr. Mock, anything else from the

7  United States?

8        MR. MOCK:  Yes, Your Honor.  Just one last thing

9  with respect to the deposition of Doctor Golz.  If any of the

10  unclean hands or equitable defenses survive, we would also

11  seek Doctor Golz's deposition.

12        In particular, we've heard a lot this morning

13  about how HUD allegedly impoverished Ms. Golz.  Ms. Golz had

14  $65,000.00 still in her HECM in 2009.  That was withdrawn in

15  a series of unscheduled distributions right around the time

16  that Doctor Golz bought his home in Scottsdale.

17        And so if we're going to be --

18        MR. GOLZ:  No it wasn't.

19        THE COURT:  Hold on Mr. Golz.  Doctor Golz.  Well,

20  wait a second.  So what -- now you're raising more facts you

21  want to discover regarding the affirmative defenses.

22        But didn't Mr. Golz in his response to your motion

23  to strike raise these kinds of issues, or are you just

24  hearing them for the first time right now?

25        MR. MOCK:  No, Your Honor.  This is -- if any of

1  the equitable defenses were to survive, we would also wish to

2  establish that Doctor Golz has unclean hands.

3         THE COURT:  Okay, you just wanted to talk about

4  discovery and --

5         MR. MOCK:  Sauce for the goose is sauce for the

6  gander.

7         THE COURT:  I understand.  All right.  Anything

8  else?

9         MR. MOCK:  No, thank you, Your Honor.

10        THE COURT:  Okay.  Now, Doctor Golz, anything else

11 from you?

12        MR. GOLZ:  No, I don't think so at this time,

13 except that I would assert that their entire claim is based

14 on the deed of trust and the fact that my mother is -- when

15 she died, they're allowed to foreclose.

16        Everything -- every defense that I've raised, Your

17 Honor, is based upon written documentation.

18        And the Government didn't raise in their paragraph

19 50, or whatever it was in their complaint, any breach of

20 contract issue.  It's too late to raise that now.

21        As far as my having unclean hands, they're trying

22 to -- well, let's see if we can sully Doctor Golz's

23 reputation as well as his mother's.  And it's just a

24 scurrilous -- it's unwarranted, it's unneeded.

25        All of my defenses are based upon letters I wrote

1    to HUD, and based upon HUD handbooks, and written items, and

2    everything else.  There is no reason for the Government to

3    use its unlimited budget to try to attack me and drag me into

4    a full day deposition to try to discredit or stain my

5    mother's reputation, and to somehow embarrass and humiliate

6    and drive up my costs even more than they already have.

7         So I don't -- I'm going to submit that the

8    Government doesn't need any discovery from me, because I've

9    given them hundreds of pages of documentation.  I've been

10   completely forthright with them.

11        They are now trying to go into all of this

12   innuendo and things about withdrawals from my mother's

13   account, and none of that is relevant.

14        THE COURT:  Okay.  Well, one other thing I wanted

15   to bring up, my staff is just bringing to my attention, I

16   think your position on where she lived or anything dealing

17   with her residence, is that she didn't violate the terms of

18   the note, right?  That's your position?

19        MR. GOLZ:  Correct, yeah.

20        THE COURT:  Because you did sign a statement under

21   oath that she was domiciled in Arizona in 2014.

22        MR. GOLZ:  What statement was that?

23        THE COURT:  You signed a document under oath and

24   notarized, and it's dated September 11, 2014.  And you filed

25   it in the Superior Court of Arizona, Maricopa County.  It's

1   exhibit 8 to the Government's complaint, and it says in

2   paragraph 2:  "Decedent died on May 16, 2014, at the age of

3   88 years, while domiciled in Maricopa County, State of

4   Arizona."

5           MR. GOLZ:  I did that under the advice of my

6   counsel -- of the probate counsel, John Kitchel.  And I

7   addressed that in admissions and denials of my amended

8   answer.

9           THE COURT:  Okay.

10          MR. GOLZ:  And Mr. Kitchel advised me, and I gave

11  him -- Mr. Kitchel had my mother's death certificate where it

12  states that her usual residence was 130 Beaver Creek Drive in

13  Boulder, Colorado, and the Court actually has that as one of

14  my exhibits, I think to my response to the Government's

15  motion to strike.  It's part of John Kitchel's letter to the

16  Secretary, which was written -- I think the letter was dated

17  September 17, 2014.

18          And so Mr. Kitchel advised me that because the

19  only -- the only asset in the Estate was the property in

20  Boulder, Colorado, and since that property in Boulder,

21  Colorado, had to be transferred according to State law, there

22  was no personal property or anything else, that would be

23  affected by State law taxes or anything, that it was -- that

24  for the purpose of this, it was legally equivalent whether I

25  opened probate in Colorado or here.

1          And he said "since you're here, and since you know

2    me, I can open it here for you, so your statement that your

3    mother's domicile," we had this specific conversation while I

4    was sitting there across the desk from Mr. Kitchel, and I

5    said "well, look, she's always maintained that her residence

6    is 130 Beaver Creek Drive."

7          He said "yes, but for the sake of this, domicile

8    simply means that she was with you and that she died in

9    Arizona, and it has not other legal effect outside of that."

10          So that was done on the advice of counsel, and I

11   explained that very clearly in my answer.

12          THE COURT:  Okay, thank you.  So please, within

13   the next week, if you can, work out this issue on whether we

14   can avoid the lack of an attorney for the Estate so you can

15   execute all -- you don't have to have the documents executed,

16   but you just have to get your position defined and let me

17   know whether you think you're going to work that out.

18          If you don't think you will, then I need the

19   position paper on whether the Estate can be represented by

20   Doctor Golz.  Okay?

21          MR. MOCK:  Yes, Your Honor.

22          THE COURT:  All right.  Thank you, Doctor Golz.

23   Take care.

24          MR. GOLZ:  Uh-huh.

25          THE COURT:  All right, good bye.

1          MR. GOLZ:  Bye.

2                  (Time noted:  10:58 a.m.)

3                        *  *  *  *  *

4                      CERTIFICATE

5      I, RANDEL RAISON, certify that the foregoing is a

6  correct transcript from the official electronic sound

7  recording of the proceedings in the above-entitled matter, to

8  the best of my ability.

9

10

11  _____          October 15, 2018

12  Randel Raison

13

14

15

16

17

18

19

20

21

22

23

24

25